999 So.2d 601 (2008)
FLORIDA HOUSE OF REPRESENTATIVES, et al., Petitioners,
v.
The Honorable Charles J. CRIST, Jr., etc., Respondent.
No. SC07-2154.
Supreme Court of Florida.
July 3, 2008.
Rehearing Denied September 11, 2008.
*603 Jeremiah H. Hawkes, General Counsel, Florida House of Representatives, Tallahassee, FL, and Jon L. Mills and Timothy McLendon, Gainesville, FL, for Petitioners.
Christopher M. Kise and James A. McKee of Foley and Lardner, Tallahassee, FL, and Paul C. Huck, Jr., General Counsel, Gerald B. Curington, Deputy General Counsel, and Erick M. Figlio, Assistant General Counsel, Executive Office of the Governor, Tallahassee, FL, for Petitioner, Charles J. Crist, Jr., in his capacity as Governor of Florida.
Barry S. Richard and Glenn T. Burhans, Jr. of Greenberg Traurig, P.A., Tallahassee, FL, and Jerry C. Straus, F. Michael Willis, and Joseph H. Webster of Hobbs, Straus, Dean, and Walker, LLP, Washington, DC, for Petitioner, The Seminole Tribe of Florida.
Jason Vail, Special Counsel, Tallahassee, FL, on behalf of The Florida Senate; Cynthia S. Tunnicliff, Marc W. Dunbar, and Brandice D. Dickson of Pennington, Moore, Wilkinson, Bell, and Dunbar, P.A., Tallahassee, FL, on behalf of Gulfstream Park Racing Association, Inc.; and Andre McKenney and David Jove, Hallandale Beach, FL, on behalf of City of Hallandale Beach, as Amici Curiae.
CANTERO, J.
After almost sixteen years of sporadic negotiations with four governors, in November 2007 the Seminole Indian Tribe of Florida signed a gambling "compact" (a contract between two sovereigns) with Florida Governor Charles Crist. The compact significantly expands casino gambling, also known as "gaming," on tribal lands. For example, it permits card games such as blackjack and baccarat that are otherwise prohibited by law. In return, the compact promises substantial remuneration to the State.
The Florida Legislature did not authorize the Governor to negotiate the compact before it was signed and has not ratified it since. To the contrary, shortly after the compact was signed, the Florida House of Representatives and its Speaker, Marco Rubio, filed in this Court a petition for a writ of quo warranto disputing the Governor's authority to bind the State to the compact. We have exercised our discretion to consider such petitions, see art. V, § 3(b)(8), Fla. Const., and now grant it on narrow grounds. We hold that the Governor does not have the constitutional authority to bind the State to a gaming compact that clearly departs from the State's public policy by legalizing types of gaming that are illegal everywhere else in the state.
In the remainder of this opinion, we describe the history of Indian gaming compacts in general and the negotiations leading up to the compact at issue. We then explain our jurisdiction to consider the petition. Finally, we discuss the applicable constitutional provisions, statutes, and cases governing our decision.

*604 I. THE FACTUAL AND LEGAL BACKGROUND
We analyze the compact in the context of the federal regulations authorizing it as well as the background of the negotiations in this case. We first review the statutory foundation for the compact: the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (2000) (IGRA). Next, we detail the history of the Tribe's attempts to negotiate a compact with the State. Finally, we explain the compact's relevant terms.

A. IGRA
Indian tribes are independent sovereigns. The Indian Commerce Clause of the United States Constitution grants only Congress the power to override their sovereignty on Indian lands. U.S. Const., art. I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce with... the Indian Tribes."); see also California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (noting that tribal sovereignty is subordinate only to the federal government). Before IGRA, states had no role in regulating Indian gaming. See Cabazon, 480 U.S. at 202, 107 S.Ct. 1083.
Congress enacted IGRA in 1988. Among other things, the statute provides "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA divides gaming into three classes: Class I includes "social games solely for prizes of minimal value." Id. § 2703(6). Class II includes "the game of chance commonly known as bingo" and "non-banked" card gamesthat is, games in which participants play against only each other; the host facility (the "house") has no stake in the outcome. Id. § 2703(7). Class III the only type relevant herecomprises all other types of gaming, including slot machines, pari-mutuel wagering (such as horse and greyhound racing), lotteries, and "banked" card gamessuch as baccarat, blackjack (twenty-one), and chemin de ferin which participants play against the house. Id. § 2703(6)-(8).
IGRA permits Class III gaming on tribal lands, but only in limited circumstances. It is lawful only if it is (1) authorized by tribal ordinance, (2) "located in a State that permits such gaming for any purpose by any person, organization, or entity," and (3) "conducted in accordance with a Tribal-State compact entered into by the Indian tribe and the State ... that is in effect." Id. § 2710(d)(1) (emphasis added).
IGRA provides for tribes to negotiate compacts with their host states. Upon a tribe's request, a state "shall negotiate with the Indian tribe in good faith to enter into such a compact." Id. § 2710(d)(3)(A) (emphasis added). If the parties successfully negotiate a compact and the Secretary of the Department of the Interior (Department) approves it, the compact takes effect "when notice of approval by the Secretary" is published in the Federal Register. Id. § 2710(d)(3)(B), (8).
If negotiations fail, IGRA allows a tribe to sue the state in federal court. If the state continues to refuse consent, the Secretary may "prescribe ... procedures" permitting Class III gaming. See id. § 2710(d)(7)(B)(vii). The United States Supreme Court has held, howeverin a case involving the Seminole Tribe's attempts to offer Class III gaming in Floridathat IGRA did not abrogate the states' Eleventh Amendment immunity. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 47, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Therefore, states need not consent to such lawsuits. The Department later created an alternative procedure under *605 which, when a tribe cannot negotiate a compact and a state asserts immunity, the Secretary may prescribe Class III gaming. See Class III Gaming Procedures, 64 Fed. Reg. 17535-02 (Apr. 12, 1999) (codified at 25 C.F.R. pt. 291 (2007)). At least one federal court, however, has held that the Secretary lacked authority to promulgate such regulations. See Texas v. United States, 497 F.3d 491, 493 (5th Cir.2007), petition for cert. filed sub nom. Kickapoo Traditional Tribe of Texas v. Texas, 76 U.S.L.W. 3471 (U.S. Feb. 25, 2008) (No. 07-1109). Therefore, their validity remains questionable.

B. The Negotiations Between the Tribe and the State
With this statutory framework in mind, we briefly describe the protracted history of the Seminole Tribe's efforts to negotiate a compact for conducting Class III gaming in Florida. These negotiations spanned sixteen years and four different governors.
The Seminole Indian Tribe is a federally recognized Indian tribe whose reservations and trust lands are located in the State. The Tribe currently operates Class II gaming facilities, offering low stakes poker games and electronically aided bingo games. The Tribe first sought a compact allowing it to offer Class III gaming in 1991. That January, the Tribe and Governor Lawton Chiles began negotiations, but they ultimately proved fruitless. That same year, the Tribe filed suit in federal court alleging that the State had failed to negotiate in good faith. As noted earlier, the Supreme Court ultimately ruled that the State could assert immunity, and it did. See Seminole Tribe, 517 U.S. at 47, 116 S.Ct. 1114, aff'g Seminole Tribe of Fla. v. Fla., 11 F.3d 1016 (11th Cir.1994).
Over the next several years, the Tribe repeatedly petitioned the Department to establish Class III gaming procedures. In 1999, the Department did so. It found the Tribe eligible for the procedures and called an informal conference, which was held in Tallahassee that December. At the State's suggestion, however, the Tribe agreed to suspend the conference, though only temporarily. In January 2001, the Secretary issued a twenty-page decision allowing the Tribe to offer a wide range of Class III games. When the State requested clarification, however, the Secretary withdrew the decision. The delay continued. Finally, five years laterin May 2006the Department reconvened the conference in Hollywood, Florida, and in September of that year warned that if the Tribe and the State did not execute a compact within 60 days, the Department would issue Class III gaming procedures. Despite the parties' failure to negotiate a compact, however, the Department never issued procedures.
Apparently exasperated with the slow progress of the procedures, in March 2007 the Tribe sued the Department in federal court. See Seminole Tribe of Fla. v. United States, No. 07-60317-CIV, 2007 WL 5077484 (S.D. Fla. filed Mar. 6, 2007). The Department then urged Governor Crist to negotiate a compact, warning that if a compact was not signed by November 15, 2007, the Department would finally issue procedures. Under the proposed procedures, the State would not receive any revenue and would have no control over the Tribe's gaming operations. The Tribe would be authorized to operate slot machines and "card games," defined as "a game or series of games of poker (other than Class II games) which are played in a nonbanking manner." (Emphasis added.) Notably, the alternative procedures would not have permitted the Tribe to operate banked card games such as blackjack.[1]
*606 On November 14the day before the deadlinethe Governor agreed to a compact with the Tribe (Compact). Five days later, the House and its Speaker, Marco Rubio, filed this petition disputing the Governor's authority to bind the State to the Compact without legislative authorization or ratification. We allowed the Tribe to join the action as a respondent.[2]
On January 7, 2008, upon publication of the Secretary's approval, the Compact went into effect. See Notice of Deemed Approved Tribal-State Class III Gaming Compact, 73 Fed.Reg. 1229 (Jan. 7, 2008). The parties agree, however, that the Secretary's approval does not render the petition moot.[3]

C. The Compact
The Compact recites that the Governor "has the authority to act for the State with respect to the negotiation and execution of this Compact." It covers a period of twenty-five years and allows the Tribe to offer specified Class III gaming at seven casinos in the State. It establishes the terms, rights, and responsibilities of the parties regarding such gaming. We discuss only its more relevant provisions.
The Compact authorizes the Tribe to conduct "covered gaming," which includes several types of Class III gaming: slot machines; any banking or banked card game, including baccarat, blackjack (twenty-one), and chemin de fer; high stakes poker games; games and devices authorized for the state lottery; and any new game authorized by Florida law. The Compact expressly does not authorize roulette- or craps-style games. The gaming is limited to seven casinos on tribal lands in six areas of the state: Okeechobee, Coconut Creek, Hollywood (two), Clewiston, Immokalee, and Tampa. Compact pt. IV. B., at 7-8.
The Compact grants the Tribe the exclusive right to conduct certain types of gaming. That is, the Tribe may conduct some Class III gaming, such as banked card games, that is prohibited under state law. Based on that "partial but substantial exclusivity," the Tribe must pay the State a share of the gaming revenue. That share is based in part on amounts that increase at specified thresholds: when the Compact becomes effective, the State receives $50 million. Over the first twenty-four months of operation, it will receive another $175 million. Thereafter, for the third twelve months of operation the State will receive $150 million, and for each twelve-month cycle after that, a minimum of $100 million. If the State breaches the exclusivity provision, howeverby legalizing any Class III gaming currently prohibited under state lawthe Tribe may cease its payments. The Compact (attached as an appendix to this opinion) is thirty-seven pages long and contains several other provisions we need not detail here.[4]

*607 II. JURISDICTION
Before discussing the issue presented, we first address our jurisdiction. The House and Speaker Rubio have filed in this Court a petition for writ of quo warranto. The Governor contends that this Court lacks jurisdiction because the House does not seek either to remove him from office or to enjoin the future exercise of his authority. We conclude, however, that these are not the only grounds for issuing such a writ.
The Florida Constitution authorizes this Court to issue writs of quo warranto to "state officers and state agencies." Art. V, § 3(b)(8), Fla. Const. The term "quo warranto" means "by what authority." This writ historically has been used to determine whether a state officer or agency has improperly exercised a power or right derived from the State. See Martinez v. Martinez, 545 So.2d 1338, 1339 (Fla.1989); see also art. V, § 3(b)(8), Fla. Const. Here, the Governor is a state officer. The House challenges the Governor's authority to unilaterally execute the Compact on the State's behalf.
The Governor argues that because he already has signed the Compact, quo warranto relief is inappropriate. But the writ is not so limited. In fact, petitions for the writ historically have been filed after a public official has acted. See, e.g., Chiles v. Phelps, 714 So.2d 453, 455 (Fla.1998) (holding that the Legislature and its officers exceeded their authority in overriding the Governor's veto); State ex rel. Butterworth v. Kenny, 714 So.2d 404, 406 (Fla. 1998) (issuing the writ after the Capital Collateral Regional Counsel had filed a federal civil rights suit, concluding that it had no authority to file it). The Governor's execution of the Compact does not defeat our jurisdiction.
The concurring-in-result-only opinion expresses concern that by considering a more narrow issue than the Governor's authority to execute IGRA compacts in generalthat is, whether the Governor has the authority to bind the State to a compact that violates Florida lawwe are expanding our quo warranto jurisdiction to include issues normally reserved for declaratory judgment actions. In prior quo warranto cases, however, we have considered separation-of-powers arguments normally reviewed in the context of declaratory judgments, such as whether the Governor's action has usurped the Legislature's power, "where the functions of government would be adversely affected absent an immediate determination by this Court." Phelps, 714 So.2d at 457; see also Martinez, 545 So.2d at 1339 (holding quo warranto appropriate to test the governor's power to call special sessions); Orange County v. City of Orlando, 327 So.2d 7 (Fla.1976) (holding that the legality of city's actions regarding annexation ordinances can be inquired into through quo warranto).
In this case, the Secretary has approved the Compact and, absent an immediate judicial resolution, it will be given effect. *608 In fact, according to news reports, the Tribe already has begun offering blackjack and other games at the Seminole Hard Rock Hotel and Casino. See Amy Driscoll, "Casino Gambling: Amid glitz, blackjack's in the cards," The Miami Herald, June 23, 2008, at B1. Thus, if indeed the Governor has exceeded his constitutional authority, a compact that violates Florida law will, nevertheless, become effective in seven casinos located on tribal lands located in the state. As in Phelps, therefore, the importance and immediacy of the issue justifies our deciding this matter now rather than transferring it for resolution in a declaratory judgment action.

III. DISCUSSION OF LAW
We now discuss the law that applies to this inter-branch dispute. In deciding whether the Governor or the Legislature has the authority to execute a compact, we first define a "compact" and its historical use in Florida. We then discuss how other jurisdictions have resolved this issue. Next, we review the relevant provisions of our own constitution. Finally, we explain our conclusion that the Governor lacked authority under our state's constitution to execute the Compact because it changes the state's public policy as expressed in the criminal law and therefore infringes on the Legislature's powers.

A. Compacts and their Use in Florida
A compact is essentially a contract between two sovereigns. Texas v. New Mexico, 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987); see Black's Law Dictionary 298 (8th ed.1999) (defining a compact as "[a]n agreement or covenant between two or more parties, esp[ecially] between governments or states"). The United States Supreme Court has described compacts as "a supple device for dealing with interests confined within a region." State ex rel. Dyer v. Sims, 341 U.S. 22, 27, 71 S.Ct. 557, 95 L.Ed. 713 (1951). The United States Constitution provides that "[n]o State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State, or with a foreign Power." U.S. Const. art. I, § 10. IGRA establishes the consent of Congress to execute gaming compacts, but requires federal approval before they become effective. See 25 U.S.C. § 2710(d)(8).
Like many states, Florida has executed compacts on a range of subjects, including environmental control, water rights, energy, and educationmore than thirty in all. The vast majority were executed with other states. In most cases, the Legislature enacted a law. See, e.g., § 372.831, Fla. Stat. (2007) ("The Wildlife Violator Compact is created and entered into with all other jurisdictions legally joining therein in the form substantially as follows[.]"); § 257.28 (Interstate Library Compact); § 252.921 (Emergency Management Assistance Compact); § 322.44 (Driver License Compact). In others, the Legislature authorized the Governor to execute a compact in the form provided in a statute. See, e.g., § 370.19, Fla. Stat. (2007) ("The Governor of this state is hereby authorized and directed to execute a compact on behalf of the State of Florida with any one or more of [the following states] ... legally joining therein in the form substantially as follows[.]"); § 370.20 (containing the same authorization and establishing the terms for the Gulf States Marine Fisheries Compact); § 403.60 (using the same authorization language for the Interstate Environmental Control Compact, establishing its terms, and "signif[ying] in advance" the Legislature's "approval and ratification of such compact"). In a fewincluding a compact among the State, the Tribe, and the South Florida Water Management District regulating water use on Tribal landsthe Legislature by statute approved *609 and ratified the compact. § 285.165, Fla. Stat. (2007). Thus, by tradition at least, it is the Legislature that has consistently either exercised itself or expressly authorized the exercise of the power to bind the State to compacts. We have found no instance in which the governor has signed a compact without legislative involvement.
Although tradition bears some relevance, it does not resolve the question of which branch actually has the constitutional authority to execute compacts in general and gaming compacts in particular. As explained above, the Compact here governs Class III gaming on certain tribal lands in Florida. The issue is whether, regardless of whether the Governor bucked tradition, he had constitutional authority to execute the Compact without the Legislature's prior authorization or, at least, subsequent ratification.

B. How Other Courts Have Answered the Question
Although Florida has not addressed a governor's authority to bind a state to an IGRA compact, other states have. We examine but a few. In State ex rel. Stephan v. Finney, 251 Kan. 559, 836 P.2d 1169, 1182 (1992), the governor executed the compact. In deciding his authority to do so, the Kansas Supreme Court examined the "the nature of the obligations undertaken" by the executed IGRA compact. The court noted that many of the compact's provisions were "clearly legislative in nature," such as creating a state agency and assigning new duties to extant state agencies, and concluded that many provisions "would operate as the enactment of new laws and the amendment of existing laws." Id. at 1185. The court therefore held that, although the governor had authority to negotiate the compact, "the Governor ha[d] no power to bind the State to the terms thereof." Id.
The New York Court of Appeals has arrived at the same conclusion. After examining IGRA's list of several permissible areas of negotiation for a tribal-state compact, see 25 U.S.C. § 1071(d)(3)(C), the court concluded that "these issues necessarily make fundamental policy choices that epitomize `legislative power.'" Saratoga County Chamber of Commerce, Inc. v. Pataki, 100 N.Y.2d 801, 766 N.Y.S.2d 654, 798 N.E.2d 1047, 1060 (2003).[5] Further, like the Kansas Supreme Court, the court found that the compact's designation of an agency to oversee the gaming and the authority of the agency to promulgate rules "usurped the Legislature's power." 766 N.Y.S.2d at 668, 798 N.E.2d at 1061. The court held that the governor "lack[ed] the power unilaterally to negotiate and *610 execute tribal gaming compacts under IGRA." Id.
Applying the test of "whether the Governor's action disrupts the proper balance between the executive and legislative branches," the New Mexico Supreme Court similarly found a gaming compact unduly disruptive of the legislature's powers. State ex rel. Clark v. Johnson, 120 N.M. 562, 904 P.2d 11, 23 (1995). The court found that the compact granted extended gaming rights, authorized gaming in contravention of legislative policy, and assigned the roles of the state and the tribe with respect to gaming regulation and civil and criminal jurisdiction. Id. at 23-24. Stating that "[r]esidual governmental authority should rest with the legislative branch rather than the executive branch," id. at 24, the court held that the "Governor lacked authority under the state Constitution to bind the State by unilaterally entering into the compacts and revenue-sharing agreements in question." Id. at 25; see also Panzer v. Doyle, 271 Wis.2d 295, 680 N.W.2d 666, 698, 700 (2004) (where a state statute authorized the governor to execute a gaming compact, holding that the governor exceeded his power by permitting the tribes to engage in certain games prohibited by state law and to waive state sovereign immunity).
Federal courts, too, have concluded that a state's governor did not have the authority to bind the state to a gaming compact. In Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1548 (10th Cir.1997), the circuit court held that the Secretary's approval of a compact could not cure an ultra vires act by the state's governor, and the question of "whether a state has validly bound itself to a compact" must be decided under state law. Id. at 1557. Noting the New Mexico Supreme Court's "thorough and careful analysis of state law" in Clark, the Tenth Circuit accepted it as determinative on the question of whether its governor had authority to bind the state to the compacts. Id. at 1559.
In all these cases, to determine which branch had the authority to bind the state to the compact, courts analyzed the nature and effect of the IGRA compact at issue and compared it to the powers the state constitution delegated to the respective branches. The courts found the compacts within the legislative power because they created or assigned new duties to agencies, conflicted with state law, changed state law, or restricted the legislature's power. Finally, recognizing that state legislative power is limited only by the state and federal constitutions, several courts have ascribed to the legislature, rather than the executive, any residual power on which the state constitutions were silent. See Clark, 904 P.2d at 25; Pataki, 766 N.Y.S.2d at 668 n. 11, 798 N.E.2d at 1061 n. 11. We now review our own state constitution in the context of IGRA's provisions and the Compact signed in this case.

C. Florida Constitutional Provisions
The House contends that several of the Compact's provisions encroach on the Legislature's law- and policy-making powers. To answer the question, we first review the separation-of-powers provisions of the Florida Constitution and our interpretations of it. We then discuss one specific provision on which the Governor relies: the "necessary business" clause.

1. The Florida Constitution's Delegation and Separation of Powers
The Florida Constitution generally specifies the relative powers of the three branches of government. Article II, section 3 provides innocuously that "[t]he powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining *611 to either of the other branches unless expressly provided herein." In construing our constitution, we have "traditionally applied a strict separation of powers doctrine." Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004) (quoting State v. Cotton, 769 So.2d 345, 353 (Fla.2000)).
These provisions are not specific, however. In fact, as we first noted 100 years ago, the state constitution does not exhaustively list each branch's powers. State v. Atlantic Coast Line R.R. Co., 56 Fla. 617, 47 So. 969, 974 (1908). Both the Governor and the House concede that the state constitution does not expressly grant either branch the authority to execute compacts.
We must therefore expand our analysis beyond the plain language of the constitution. We have held that the powers of the respective branches "are those so defined ... or such as are inherent or so recognized by immemorial governmental usage, and which involve the exercise of primary and independent will, discretion, and judgment, subject not to the control of another department, but only to the limitations imposed by the state and federal Constitutions." Id. at 974. A branch has "the inherent right to accomplish all objects naturally within the orbit of that department, not expressly limited by the fact of the existence of a similar power elsewhere or the express limitations in the constitution." Sun Ins. Office, Ltd. v. Clay, 133 So.2d 735, 742 (Fla.1961) (quoting In re Integration of Neb. State Bar Ass'n, 275 N.W. 265, 266 (1937)). As we noted over seventy-five years ago, what determines whether a particular function is legislative, executive, or judicial "so that it may be exercised by appropriate officers of the proper department" is not "the name given to the function or to the officer who performs it" but the "essential nature and effect of the governmental function to be performed." Florida Motor Lines v. Railroad Comm'rs, 100 Fla. 538, 129 So. 876, 881 (1930).
The House argues that, precisely because the state constitution does not expressly grant the governor authority to execute compacts, such authority belongs to the Legislature. In other words, the "residual" powerthat is, powers not specifically assigned to the governorbelongs to the Legislature. Albeit many years ago and under different circumstances, we have implied as much. See State ex rel. Green v. Pearson, 153 Fla. 314, 14 So.2d 565, 567 (1943) ("The legislative branch looks to the Constitution not for sources of power but for limitations upon power. But if such limitations are not found to exist, its discretion reasonably exercised may not be disturbed by the judicial branch of the government."); State ex rel. Cunningham v. Davis, 123 Fla. 41, 166 So. 289, 297 (1936) ("The test of legislative power is constitutional restriction; what the people have not said in their organic law their representatives shall not do, they may do."). And, as we noted above, other state courts have ascribed to their legislatures any residual power on which the state constitutions were silent. See Clark, 904 P.2d at 25; Pataki, 766 N.Y.S.2d at 668, n. 11, 798 N.E.2d at 1061 n. 11.
We need not decide, however, whether the authority to bind the state to compacts always resides in the legislature. Although the line of demarcation is not always clear, we have noted that "the legislature's exclusive power encompasses questions of fundamental policy and the articulation of reasonably definite standards to be used in implementing those policies." B.H. v. State, 645 So.2d 987, 993 (Fla.1994); see also Askew v. Cross Key Waterways, 372 So.2d 913, 925 (Fla.1978) (stating that under the nondelegation doctrine, "fundamental and primary policy decisions shall be made by members of the *612 legislature"). Therefore, even if the Governor has authority to execute compacts, its terms cannot contradict the state's public policy, as expressed in its laws.

2. IGRA and the "Necessary Business" Clause
The Governor argues that his authority to execute the Compact derives from article IV, section 1 of the Florida Constitution. That provision states in part that "[t]he governor shall take care that the laws be faithfully executed ... and transact all necessary business with the officers of government." Art. IV, § 1(a), Fla. Const. The Governor submits that the phrase "transact all necessary business with the officers of government" includes negotiating with the Tribe and that he cannot ignore the federal directive to "negotiate"; therefore, negotiating the Compact was "necessary business" under IGRA.
IGRA provides that a tribe seeking to offer Class III gaming must "request [that] the State ... enter into negotiations" for a compact and that the "State shall negotiate with the Indian tribe in good faith." 25 U.S.C. § 2710(d)(3)(A). The Governor is therefore correct that IGRA requires states to negotiate. As other courts have recognized, however, nowhere does IGRA equate "the state" with "the governor." See Seminole Tribe, 517 U.S. at 75 n. 17, 116 S.Ct. 1114 (contrasting IGRA's "repeated[] refer[ences] exclusively to `the State'" with other federal statutes directed at a state's governor and concluding that "the duty imposed by the Act ... is not of the sort likely to be performed by an individual state executive officer or even a group of officers"); Seminole Tribe, 11 F.3d at 1029 ("IGRA uniformly addresses itself to `the State'; not once does it impose duties or responsibilities on a particular officer of the state (e.g., the governor, the legislature, etc.).").[6] In addition, when a state fails to negotiate, a tribe must sue the state, not the governor. Seminole Tribe, 517 U.S. at 74-75, 116 S.Ct. 1114 (holding that Congress intended § 2710(d)(3) to be enforced against the state, not the governor); Seminole Tribe, 11 F.3d at 1029 ("[T]hese suits are not against officials in an attempt to force them to follow federal law.").
More importantly, a State's "duty to negotiate" under IGRA cannot be enforced. A state may avoid its duty, as Florida has effectively done, by asserting its immunity. Seminole Tribe, 517 U.S. at 47, 116 S.Ct. 1114. Therefore, although IGRA requires a state to negotiate, it does not impose any duty on a state's governor. Moreover, IGRA does not prescribe the terms of a compact, see 25 U.S.C. § 2710(d), and it does not confer on the governor the authority to bind the state to a compact or act in contravention to state law. In other words, IGRA does not grant a governor, or any state actor, any powers beyond those provided by the state's constitution and laws. See Clark, 904 P.2d at 26 ("We do not agree that Congress, in enacting the IGRA, sought to invest state governors with powers in excess of those that the governors possess under state law.").
We express no opinion on whether the "necessary business" clause may ever grant the governor authority to bind the State to an IGRA compact.[7] We *613 do conclude, however, that the clause does not authorize the governor to execute compacts contrary to the expressed public policy of the state or to create exceptions to the law. Nor does it change our conclusion that "the legislature's exclusive power encompasses questions of fundamental policy and the articulation of reasonably definite standards to be used in implementing those policies." B.H., 645 So.2d at 993.
We now discuss why, in authorizing conduct prohibited by state law, the Governor exceeded his authority.

D. The Compact Violates the Separation of Powers
The House claims that the Compact violates the separation of powers on a number of grounds.[8] We find one of them dispositive. The Compact permits the Tribe to conduct certain Class III gaming that is prohibited under Florida law. Therefore, the Compact violates the state's public policy about the types of gambling that should be allowed. We hold that, whatever the Governor's authority to execute compacts, it does not extend so far. The Governor does not have authority to agree to legalize in some parts of the state, or for some persons, conduct that is otherwise illegal throughout the state.
We first discuss whether state laws in general, and gaming laws in particular, apply to Indian tribes. We next discuss Florida law on gaming. We then address the House's argument that IGRA prohibits compacts from expanding the gaming allowed under state law. Finally, we explain why the Governor lacked authority to bind the State to a compact, such as this one, that contradicts state law.

1. State Gaming Laws Apply to the Tribe
Generally, state laws do not apply to tribal Indians on Indian reservations unless Congress so provides. McClanahan v. State Tax Comm'n of Ariz., 411 U.S. 164, 170, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Therefore, the extent to which a state may enforce its criminal laws on tribal land depends on federal authorization. See Seminole Tribe of Fla. v. Butterworth, 658 F.2d 310, 312 (5th Cir.1981). Congress has, however, conferred on the states the authority to assume jurisdiction over crimes committed on tribal land, see Act of Aug. 15, 1953, Pub.L. No. 280 § 6, 67 Stat. 588, 590 (1953), and Florida has assumed such jurisdiction. See ch. 61-252, §§ 1-2, at 452-53, Laws of Fla. (codified at § 285.16, Fla. *614 Stat. (2007)); see also § 285.16(2), Fla. Stat. (2007) ("The civil and criminal laws of Florida shall obtain on all Indian reservations in this state and shall be enforced in the same manner as elsewhere throughout the state."); Op. Att'y Gen. Fla. 94-45 (1994) (discussing the state's jurisdiction over Indian reservations). The state's law is therefore enforceable on tribal lands to the extent it does not conflict with federal law. See Op. Att'y Gen. Fla. 94-45 (1994); see also Hall v. State, 762 So.2d 936, 936-38 (Fla. 2d DCA 2000) (holding that the circuit court had jurisdiction over a vehicular homicide on an Indian reservation); State v. Billie, 497 So.2d 889, 892-95 (Fla. 2d DCA 1986) (holding that a Seminole Indian was properly charged under state criminal law with killing a Florida panther on tribal land). In regard to gambling in particular, federal law provides that, except as provided in a tribal-state compact, state gambling laws apply on tribal lands. See 18 U.S.C. § 1166(a) (2000).
Based on these state and federal provisions, what is legal in Florida is legal on tribal lands, and what is illegal in Florida is illegal there. Absent a compact, any gambling prohibited in the state is prohibited on tribal land.

2. Florida's Gaming Laws
It is undisputed that Florida permits limited forms of Class III gaming. The state's constitution authorizes the state lottery, which offers various Class III games, and now permits slot machines in Miami-Dade and Broward Counties. See art. X, §§ 7, 15, Fla. Const. For a long time, the State also has regulated pari-mutuel wageringfor example, on dog and horse racing. See ch. 550, Fla. Stat. (2007) (governing pari-mutuel wagering).
It is also undisputed, however, that the State prohibits all other types of Class III gaming, including lotteries not sponsored by the State and slot machines outside Miami-Dade and Broward Counties. Florida law distinguishes between nonbanked (Class II) card games and banked (Class III) card games.[9] A "banking game" is one "in which the house is a participant in the game, taking on players, paying winners, and collecting from losers or in which the cardroom establishes a bank against which participants play." § 849.086(2)(b); see § 849.086(1), Fla. Stat. (deeming banked games to be "casino gaming"). Florida law authorizes cardrooms at pari-mutuel facilities for games of "poker or dominoes," but only if they are played "in a nonbanking manner." § 849.086(2), Fla. Stat.; see § 849.086(1)-(3). Florida law prohibits banked card games, however. See § 849.086(12)(a), (15)(a). Blackjack, baccarat, and chemin de fer are banked card games. They are therefore illegal in Florida.

3. Does IGRA Permit Compacts to Expand Gaming?
Contrary to Florida law, the Compact allows banked card games such as blackjack, baccarat, and chemin de fer. The House argues that the Compact therefore violates IGRA itself, which permits Class III gaming only if the state "permits *615 such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1). The Governor, on the other hand, contends that, once state law permits any Class III gaming, a compact may allow all Class III gaming.
The meaning of the phrase "permits such gaming" has been heavily litigated. The question is whether, when state law permits some Class III games to be played, a tribe must be permitted to conduct only those particular games or all Class III games. See Kathryn R.L. Rand, Caught in the Middle: How State Politics, State Law, and State Courts Constrain Tribal Influence Over Indian Gaming, 90 Marq. L.Rev. 971, 983 (2007) (citing cases). The Secretary's interpretation of this provision supports the House's argument. See Class III Gaming Procedures, 63 Fed. Reg. 3289, 3293 (Jan. 22, 1998) (Proposed Rules) ("IGRA thus makes it unlawful for Tribes to operate particular Class III games that State law completely and affirmatively prohibits."). So do a majority of federal courts. See, e.g., Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1258 (9th Cir.1994) ("[A] state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have."); see also Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273, 279 (8th Cir.1993) (stating that IGRA "does not require the state to negotiate with respect to forms of gaming it does not presently permit"); but see Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin, 770 F.Supp. 480, 486 (W.D.Wis. 1991) ("Congress did not intend the term `permits such gaming' to limit the tribes to the specific types of gaming activity actually in operation in a state."). Our Attorney General has agreed with the majority interpretation. See Op. Att'y Gen. Fla. 2007-36 at 3 (2007) ("[I]n light of the greater weight of federal case law and the Department of the Interior's interpretation of IGRA, Class III gaming activities subject to mandatory negotiations between a state and an Indian tribe do not include those specifically prohibited by state law.").
Whether the Compact violates IGRA, however, is a question we need not and do not resolve. Given our narrow scope of review on a writ of quo warranto, the issue here is only whether the Florida Constitution grants the Governor the authority to unilaterally bind the State to a compact that violates public policy. We conclude that even if the Governor is correct that IGRA permits the expansion of gaming on tribal lands beyond what state law permits, such an agreement represents a significant change in Florida's public policy. It is therefore precisely the type of action particularly within the Legislature's power. We now discuss that issue.

4. The Compact Violates Florida's Public Policy on Gaming
Article II, section 3 of the Florida Constitution prohibits the executive branch from usurping the powers of another branch. Enacting lawsand especially criminal lawsis quintessentially a legislative function. See State v. Barquet, 262 So.2d 431, 433 (Fla.1972) ("The lawmaking function is the chief legislative power."). By authorizing the Tribe to conduct "banked card games" that are illegal throughout Floridaand thus illegal for the Tribethe Compact violates Florida law. See Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991) ("This Court has repeatedly held that, under the doctrine of separation of powers, the legislature may not delegate the power to enact laws or to declare what the law shall be to any other branch."). The Governor's action therefore encroaches on the legislative function and was beyond his authority. *616 Nor does it matter that the Compact is a contract between the State and the Tribe. Neither the Governor nor anyone else in the executive branch has the authority to execute a contract that violates state criminal law. Cf. Local No. 234, United Assoc. of Journeymen & Apprentices of Plumbing & Pipefitting Industry v. Henley & Beckwith, Inc., 66 So.2d 818, 821 (Fla.1953) ("[A]n agreement that is violative of a provision of a constitution or a valid statute, or an agreement which cannot be performed without violating such a constitutional or statutory provision, is illegal and void."); City of Miami v. Benson, 63 So.2d 916, 923 (Fla.1953) ("The contract in question, that is, the acceptance by the City of the proposal made by its agent, employee or advisor, to purchase the bonds, is contrary to public policy and is, therefore, void.").

IV. CONCLUSION
We conclude that the Governor's execution of a compact authorizing types of gaming that are prohibited under Florida law violates the separation of powers. The Governor has no authority to change or amend state law. Such power falls exclusively to the Legislature. Therefore, we hold that the Governor lacked authority to bind the State to a compact that violates Florida law as this compact does. We need not resolve the broader issue of whether the Governor ever has the authority to execute compacts without either the Legislature's prior authorization or, at least, its subsequent ratification. Because we believe the parties will fully comply with the dictates of this opinion, we grant the petition but withhold issuance of the writ.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, and BELL, JJ., concur.
QUINCE, C.J., concurs in result only.
LEWIS, J., concurs in result only with an opinion.
LEWIS, J., concurring in result only.
I concur in result only based upon two aspects of the majority opinion which cause concern. First, I would conclude that the majority's analysis and discussion with regard to the Governor's power to enter into a compact is overly restrictive. Second, I question whether the writ of quo warranto is the appropriate remedy for the relief the majority grants today.

THE CONSTITUTIONAL AUTHORITY OF THE GOVERNOR[10]
I cannot agree with the analysis of the majority, which is unduly restrictive with regard to the constitutional powers of the Governor as the chief executive officer of the State of Florida. The general thrust of the majority opinion indicates that the "necessary business" clause of article IV, section 1(a) of the Florida Constitution does not authorize the Governor to bind the State to an IGRA compact, and the opinion relies upon foreign cases which suggest similar limitations upon the actions of governors in other jurisdictions. I disagree and instead conclude that, if the Compact had not granted and authorized certain types of Class III gaming that are specifically prohibited by state law, the Governor would have been authorized pursuant to the necessary-business clauseto enter into a compact on behalf of the State without either legislative authorization or ratification under the circumstances *617 presented by the instant case. See Dewberry v. Kulongoski, 406 F.Supp.2d 1136, 1154 (D.Or.2005) (determining that the execution of a gaming compact was "necessary business" that the governor was authorized to transact under an identical constitutional provision). To the extent the majority suggests otherwise, I disagree.
While I agree that the Governor may not bind the State to a compact that specifically conflicts with existing state law, in my view the constitutional provision does afford the Governor a field of operation to enter into a binding compact under circumstances in which the other branches of government have ignored a problem or neglected to act and have thereby created a void by governmental inaction or a total vacuum in an area that will likely create or produce a negative impact for Florida and the citizens of this State. This power is particularly applicable when that void or vacuum has existed with regard to a known problem or issue for an extensive period of time and adverse consequences are reasonably imminent. Here, despite the fact that this gaming issue existed and the Tribe actively sought to negotiate resolution in a compact for almost sixteen years, the Legislaturehaving full access to the information and issuesdid not act. In an effort to protect Florida and the citizens of this State from the results of the federal Department's clear statement that it would issue Class III gaming procedures (under which the State would receive no revenue and possess no control over the Tribe's gaming operations) and the pending legal action, the Governor negotiated a compact. Under these imminent circumstances, the Governor's action constituted "necessary business," which that office was required to address in an attempt to protect the public interest. To hold otherwise would strip the necessary-business clause of any meaningful field of operation. See Broward County v. City of Ft. Lauderdale, 480 So.2d 631, 633 (Fla. 1985) ("[A] construction of the constitution which renders superfluous, meaningless or inoperative any of its provisions should not be adopted by the courts.").
In my view, the Governor generally possesses the authority to act under a broad range of circumstances where the failure of the other branches of government to act for an extended period of time imminently threatens harm. This may conceivably address matters such as the quality of life, health, or welfare of the citizens of Florida. For example, an emergency that threatens imminent harm to the quality of air or water in Florida may constitute "necessary business" for the Governor depending on the circumstances presented. Further, the Governor is bound by our state Constitution to "take care that the laws be faithfully executed." Art. IV, § 1(a), Fla. Const. In my view, this duty includes the negotiation of inter-sovereign compacts that (1) are consistent with preexisting state law and (2) further the interests of the State of Florida.[11] These *618 constitutional provisions should be interpreted to afford the Governor the power and authority to negotiate with another sovereign concerning those issues that significantly impact this State and the general well-being of the State even without legislative authorization or ratification under certain circumstances.[12]

QUO WARRANTO
I have concerns with the manner in which the majority has framed the issue presented by this case because it appears to expand the writ of quo warranto to circumstances in which it was never intended to apply. Historically, this Court has interpreted the writ of quo warranto as a means to challenge the authority or power of a public officer or agency to act in an official capacity. See, e.g., Martinez v. Martinez, 545 So.2d 1338, 1339 (Fla. 1989) (challenge to the constitutional authority of the Governor to call more than one legislative special session); State ex rel. Butterworth v. Kenny, 714 So.2d 404, 406 (Fla.1998) (challenge to the authority of capital collateral regional counsel to file extraneous actions); State ex rel. Smith v. Jorandby, 498 So.2d 948, 950 (Fla.1986) (challenge to the authority of public defenders to file actions that do not address an indigent defendant's liberty interest); State ex rel. Smith v. Brummer, 443 So.2d 957, 958-59 (Fla.1984) (challenge to the authority of the public defender to accept appointment from federal court to represent defendants during federal habeas-corpus proceedings); Austin v. State ex rel. Christian, 310 So.2d 289, 291 (Fla.1975) (challenge to the Governor's authority to assign state attorneys to other circuits). The writ compels a public officer or agency to establish the authority by which it takes official action. See, e.g., State ex rel. Watson v. City of Holly Hill, 46 So.2d 498, 499 (Fla.1950) (challenge to the power of a city to levy and collect taxes on lands). Most recently, we have explained:
Quo warranto is "[a] common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." Black's Law Dictionary 1285 (8th ed.2004). It is the proper vehicle to challenge the "power and authority" of a constitutional officer, such as the Governor. Austin v. State ex rel. Christian, 310 So.2d 289, 290 (Fla.1975).
Crist v. Fla. Ass'n of Crim. Defense Lawyers, 978 So.2d 134, 138 n. 3 (Fla.2008).
A number of other jurisdictions have noted that quo warranto is available to address whether a public official is vested with a power under statutory or constitutional law, rather than (1) how that officer exercises those powers which have been granted or (2) the details surrounding such action. See, e.g., State ex rel. Johnson v. *619 Consumers Pub. Power Dist., 143 Neb. 753, 10 N.W.2d 784, 793-94 (1943) ("The general rule is that quo warranto will not lie for a mere irregular exercise of a conferred power although such irregularity may be sufficient when tested by other remedies to vitiate or render void the act done. If the power attaches the manner of its exercise cannot be challenged by information in quo warranto." (emphasis supplied)); State ex rel. Lommen v. Gravlin, 209 Minn. 136, 295 N.W. 654, 655 (1941) (quo warranto is improper as a remedy for official misconduct and cannot be employed to test the legality of the official action of public or corporate officers where the underlying power or authority to act exists); State ex rel. McKittrick v. Murphy, 347 Mo. 484, 148 S.W.2d 527, 530 (1941) (noting that the writ of quo warranto "is not to be used to prevent an improper exercise of power lawfully possessed"); Mora v. Genova, 1998 WL 89326, *2, 1998 U.S. Dist. Lexis 2258, at *8 (N.D.Ill. Feb. 19, 1998) (unpublished decision) ("Quo warranto is not the proper proceeding to test the Constitutional legality of the official acts of public officers." (emphasis supplied) (citing People ex rel. Chillicothe Township v. Bd. of Review of Peoria County, 19 Ill.2d 424, 167 N.E.2d 553, 553 (1960); City of Highwood v. Obenberger, 238 Ill.App.3d 1066, 179 Ill.Dec. 65, 605 N.E.2d 1079, 1087 (1992), appeal denied, 183 Ill.Dec. 859, 612 N.E.2d 511 (1993))).
The United States Supreme Court has similarly observed that a quo warranto action "must be brought against the person who is charged with exercising an office or authority without lawful right," and that "[t]he possession of power is one thing; the propriety of its exercise in particular circumstances is quite a different thing." Johnson v. Manhattan Ry. Co., 289 U.S. 479, 502, 504, 53 S.Ct. 721, 77 L.Ed. 1331 (1933) (emphasis supplied). A relevant treatise outlines that the claims of public officers to particular powers can be tested in quo warranto, although it is not available to question the validity of acts within that power. See 2 Chester J. Antieau, The Practice of Extraordinary Remedies: Habeas Corpus and the Other Common Law Writs § 4.03, at 593, § 4.34, at 663 (1987); see also 43 Fla. Jur.2d Quo Warranto § 18 ("Quo warranto cannot be used to test the legality of official actions of public or corporate officers.").
Based upon consideration of these proceedings, I have questions with regard to whether we act with proper jurisdiction. If, as I believe, the Governor possesses the authority and power to negotiate and enter into inter-sovereign compacts and has simply invalidly exercised that authority because there is a contractual term that violates preexisting state law (i.e., the ban on certain types of Class III gaming), it is most questionable whether quo warranto constitutes a proper procedural mechanism to challenge the Governor's actions. Within the context of a petitioner's challenge to the authority of a state officer or agency to act, this Court should only grant a writ of quo warranto where the officer or agency lacks the authority to act, not where the officer or agency has improperly exercised its authority. Other remedies exist and are appropriate under such circumstances.[13] If not so limited, the door has *620 been opened in this Court for judicial examination and questioning of the details of the exercise of that valid power.
In this sense, the common-law writ of quo warranto is analogous to the writ of prohibition (and arguably other extraordinary writs) in that its application should be greatly limited. This Court has held that the writ of prohibition is intended to be "very narrow in scope, to be employed with great caution and utilized only in emergencies." English v. McCrary, 348 So.2d 293, 296 (Fla.1977) (emphasis supplied). Further, "[p]rohibition lies to prevent an inferior tribunal from acting in excess of jurisdiction but not to prevent an erroneous exercise of jurisdiction." Mandico v. Taos Constr., 605 So.2d 850, 854 (Fla.1992) (emphasis supplied). Quo warranto is also an extraordinary writ, and therefore the strict interpretation applicable to the writ of prohibition is similarly applicable to this prerogative remedy.
In this case, the House of Representatives and Speaker Rubio clearly understood these limitations upon the writ of quo warranto because they expressly and precisely framed their challenge as whether the Governor possesses the authority vel non to negotiate and enter into any Indian-gaming compact without legislative approval or ratification. See Pet. at 6, 28-29 (requesting that this Court "issue a Writ of Quo Warranto to direct the Respondent to justify his authority to bind the State in a Compact with the Seminole Tribe without legislative authorization or ratification, and to issue any order necessary to clarify that the Compact is not binding and enforceable unless and until it is ratified by the Legislature" and "issue a Writ of Quo Warranto declaring that legislative authorization or ratification is necessary for any compact governing gaming on Indian lands to be valid in this State." (emphasis supplied)). Thus, the House and Speaker Rubio challenged the constitutional authority of the Governor to bind the State of Florida to any Indian-gaming compact in the absence of legislative approval or ratification.
In contrast, the majority today reframes the issue as whether the Florida Constitution grants the Governor the authority to bind the State to this Compact, see majority op. at 615-16, and then relies upon discrete details of this specific Compact to redefine the proffered claim and issue. The majority focuses entirely upon the unlawful nature of one aspect of the Compact rather than addressing the question of whether the Governor possesses the authority to bind the State to any IGRA compact without the approval or ratification of the Legislature. In essence, the majority has created an as-applied constitutional challenge to the specific details of this Compact, thereby avoiding the jurisdictionally based question of whether the Governor possesses the power and authority *621 to enter into any Indian-gaming compact in the absence of legislative endorsement. I do acknowledge application of the principle of deciding the case as narrowly as possible, but that detail-based analysis opens expanded quo warranto jurisdictional issues.
A question arises with regard to whether the rephrasing of the issue by the majority, along with its resulting decision, has altered this Court's quo warranto jurisdiction and expanded the writ beyond its intended purpose of determining whether the Governor or other state officers and agencies possess the authority or power to act vel non. The majority approaches the position that our quo warranto jurisdiction, and the writ itself, constitute a proper means of challenging either (1) the details surrounding an exercise of authority, or (2) alleged errors in official judgment. However, in circumstances such as these, the proper function of the writ is to provide the petitioner with the ability to challenge the state officer's authority to act without regard to the question of whether the officer properly exercised the authority he or she possesses. Even the cases the majority relies upon in response to my concern involve challenges to the authority of a government official or entity to act, not the details or merits of the matters within the action taken. See Martinez, 545 So.2d at 1338 (challenging the authority of the Governor to call more than one special session to discuss the same subject, not the propriety or the wisdom of the subject); Phelps, 714 So.2d at 455 (challenging the authority of the Legislature to override a veto, not the merits of the decision to override).[14]
The restructuring of the issue presented by the House and Speaker Rubio causes concern that dissatisfied individuals or entities may seek quo warranto relief whenever a public official or agency acts in a manner which is perceived to be unwise or erroneous. This has never been the objective of the extraordinary writ of quo warranto. Interpreting the writ and affording relief in such a manner leads to the establishment of the writ as a routine avenue through which challenges to allegedly erroneous official acts or judgments may be presented, rather than a means through which the threshold question of whether the officer possesses the power to act is presented. I am concerned that the majority has altered the nature of the extraordinary writ of quo warranto when it applies this remedy to address the details of the actions of the Governor or the Legislature, as opposed to addressing the actual jurisdictionally based question of whether the Governor or the Legislature possesses the authority to act with regard to the challenge presented. Cf. O'Donnell's Corp. v. Ambroise, 858 So.2d 1138, 1142 (Fla. 5th DCA 2003) (Sawaya, J., specially concurring) ("[T]o allow the use of prohibition in the instant case would, in my view, completely vitiate the limitations *622 placed upon use of the writ and convert it from an extraordinary writ to a commonly used method to appeal any erroneous order."). I am concerned with such a reinvention of the writ of quo warranto. The majority may protest that it has not done so, but its actions undermine those words. Simply saying it does not make it so, and the decisions upon which it relies do not support the statement.
If a court reframes the proceeding as an action challenging the legal correctness of the action of a state officer or agency, rather than the power and authority of the officer or agency to act, the proper procedural device is arguably a declaratory-judgment action, not a petition for writ of quo warranto. See supra note 13.[15] Moreover, this Court generally lacks original jurisdiction to consider declaratory-judgment actions. The circuit and county courts are usually the proper forums in which to seek declaratory relief. Compare art. V, § 3, Fla. Const., with § 86.011, Fla. Stat. (2007); but see art. III, § 16(c), Fla. Const. (providing for original declaratory-judgment actions in this Court with regard to legislative-apportionment resolutions).

CONCLUSION
The jurisdictionally based question framed by the House and Speaker Rubio should be answered. The Governor possesses the authority under the Florida Constitution to enter into Indian-gaming compacts. Here, however, he erroneously exercised that authority because the Compact impermissibly included authorization of Class III gaming specifically prohibited under state law. It is undisputed that the Legislature has acted in this area, and for this reason, I concur in the result of the majority. However, I disagree with the overly restrictive suggestion of the majority and generally conclude that where inaction by the other branches of government for an extended period of time has produced a vacuum under circumstances such as these, the Governor is constitutionally authorized to act under the necessary-business clause to protect the well-being of the State of Florida.

APPENDIX

COMPACT BETWEEN THE SEMINOLE TRIBE OF FLORIDA AND THE STATE OF FLORIDA

 TABLE OF CONTENTS
 Page
Part I. Title 623
Part II. Recitals 623
Part III. Definitions 624
Part IV. Authorization and Location of Covered Games 626
Part V. Rules and Regulations; Minimum Requirements for Operations 627
Part VI. Patron Disputes, Tort Claims; Prize Claims; Limited Consent to
 Suit 630
Part VII. Enforcement of Compact Provisions 631
Part VIII. State Monitoring of Compact 632

*623
Part IX. Jurisdiction 634
Part X. Licensing 634
Part XI. Payments to the State of Florida 634
Part XII. Reduction of Tribal Payments Because of Loss of Exclusivity or
 Other Changes in Florida Law 635
Part XIII. Dispute Resolution 636
Part XIV. Construction of Compact; Severance; Federal Approval 638
Part XV. Notices 639
Part XVI. Effective Date and Term 639
Part XVII. Amendment of Compact and Appendices 639
Part XVIII. Miscellaneous 639
Part XIX. Execution 641

Compact Between the Seminole Tribe of Florida and the State of Florida
This Compact is made and entered into by and between the Seminole Tribe of Florida, a federally recognized Indian Tribe ("Tribe"), and the State of Florida ("State"), with respect to the operation of Covered Games (as defined herein) on the Tribe's Indian lands as defined by the Indian Gaming Regulatory Act 25; U.S.C. Section 2701, et seq. ("IGRA").

Part I. TITLE
This document shall be referred to as the "Seminole Tribe of Florida and State of Florida Gaming Compact."

Part II. RECITALS
A. The Tribe is a federally recognized tribal government possessing sovereign powers and rights of self-government.
B. The State is a state of the United States of America possessing the sovereign powers and rights of a state.
C. The Governor of Florida is the chief executive officer of the State and has authority to act for the State with respect to the negotiation and execution of this Compact.
D. The State and the Tribe maintain a government-to-government relationship.
E. The United States Supreme Court has long recognized the right of an Indian Tribe to regulate activity on lands within its jurisdiction, but the IGRA gives states a role in the conduct of tribal gaming in accordance with negotiated tribal-state compacts.
F. The Tribe desires to offer the play of Covered Games, as defined in Part III of this Compact, as a means of generating revenues for purposes authorized by the IGRA, including without limitation the support of tribal governmental programs, such as health care, housing, sewer and water projects, police, fire suppression, general assistance for tribal elders, day care for children, economic development, educational opportunities, per capita payments to tribal members and other typical and valuable governmental services and programs for tribal members.
G. The State has been directed by the federal government to enter into compact negotiations, with the alternative being the issuance of procedures by the U.S. Department of Interior. The Department of Interior has already circulated proposed procedures that would allow the Tribe to operate Class III gaming, including unlimited slot machines, at all of its current locations without the State receiving any revenue or ability to ensure consumer protection. The Governor therefore believes that it is in the best interests of the State *624 to enter into a Compact with the Tribe, rather than be subjected to federally authorized gambling as set forth in the proposed procedures.
H. The State recognizes that the positive effects of this Compact will generally benefit all of Florida, by increased tourism, local spending, job growth and related economic development activities. The State also recognizes that the significant revenue participation pursuant to the Compact in exchange for its exclusivity provisions provide an opportunity to increase and enhance the dollars available to spend on governmental programs that benefit the citizens of Florida, such as the education of Florida's children.

Part III. DEFINITIONS
As used in this Compact and the Appendices thereto:
A. "Annual Oversight Assessment" means the assessment described in Part XI., Section C of this Compact.
B. "Class III gaming" means the forms of Class III gaming defined in 25 U.S.C. § 2703(8) and by the regulations of the National Indian Gaming Commission.
C. "Commission" means the Seminole Tribal Gaming Commission, which is the tribal governmental agency that has the authority to carry out the Tribe's regulatory and oversight responsibilities under this Compact;
D. "Compact" means this Seminole Tribe of Florida and State of Florida Gaming Compact;
E. "Covered Game" or "Covered Gaming Activity" means the following Class III gaming activities:
1. (a) Slot machines, meaning any mechanical or electrical contrivance, terminal that may or may not be capable of downloading slot games from a central server system, machine, or other device that, upon insertion of a coin, bill, ticket, token, or similar object or upon payment of any consideration whatsoever, including the use of any electronic payment system, except a credit card or debit card, is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both, may deliver or entitle the person or persons playing or operating the contrivance, terminal, machine, or other device to receive cash, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually. The term includes associated equipment necessary to conduct the operation of the contrivance, terminal, machine, or other device. Slot machines may use spinning reels, video displays, or both.
(b) If at any time, State law authorizes the use of electronic payments systems utilizing credit or debit card payment for the play or operation of slot machines for any person, the Tribe shall be authorized to use such payment systems.
2. Any banking or banked card game, including baccarat, chemin de fer, and blackjack (21);
3. High stakes poker games, as provided in Part V., Section L; and
4. Any devices or games that are authorized under State law to the Florida State Lottery, provided that the Tribe will not offer such games through the Internet unless others in the State are permitted to do so.
5. Any new game authorized by Florida law for any person for any purpose.
*625 Except as provided in Section 5 above, nothing in this definition provides the Tribe the ability to conduct roulette, craps, roulette-styled games, or craps-styled games; however, nothing herein is intended to prohibit the Tribe from operating slot machines that employ video displays of roulette, wheels or other table game themes.
F. "Covered Game Employee" or "Covered Employee" means any individual employed and licensed by the Tribe whose responsibilities include the rendering of services with respect to the operation, maintenance or management of Covered Games, including, but not limited to, the following: managers and assistant managers; accounting personnel; Commission officers; surveillance and security personnel; cashiers, supervisors, and floor personnel; cage personnel; and any other employee whose employment duties require or authorize access to areas of the Facility related to the conduct of Covered Games or the technical support or storage of Covered Game components. This shall not apply to the Tribe's elected officials provided that such individuals are not directly involved in the operation, maintenance, or management of Covered Games or Covered Games components;
G. "Documents" means books, records, electronic, magnetic and computer media documents and other writings and materials, copies thereof, and information contained therein;
H. "Effective Date" means the date on which the Compact becomes effective pursuant to Part XVI.A. of this Compact;
I. "Facility" or "Facilities" means any building of the Tribe in which the Covered Games authorized by this Compact are conducted on Indian lands as defined by the IGRA. Subject to the terms of this Compact, the Tribe shall have the ultimate responsibility for ensuring that the operation of each Facility conforms to the Compact as required herein;
J. "Guaranteed Minimum Payment" means the minimum Payment the Tribe agrees to make to the State as provided by Part XI of the Compact;
K. "IGRA" means the Indian Gaming Regulatory Act, Pub.L. 100-497, Oct. 17, 1988, 102 Stat. 2467, codified at 25 U.S.C. Section 2701 et seq. and 18 U.S.C. Sections 1166 to 1168;
L. "Net Poker Income" means the total revenue from all hands played, including buy-ins and rebuys, less overhead and operating costs. Operating costs include, but are not limited to, all tournament prizes, amenities, gifts, advertising, comps, labor, surveillance, television production and, rooms, food and beverage provided to celebrities and previously rated players as part of a tournament.
M. "Net Win" means the total receipts from the play of all Covered Games less all prize payouts and participation fees.
N. "Participation fees" means payments made to suppliers on a periodic basis by the Tribe for the right to lease or otherwise offer for play gaming devices that the Tribe does not own. Participation fees can be royalty payments, or lease payments. The Tribe assures that it holds no current interest in any company that supplies gaming devices and that if it acquires such an interest in the future, that it will forego the deduction of such fees with respect to that supplier in which it holds an interest.
O. "Patron" means any person who is on the premises of a Facility, or who is entering the Tribe's Indian lands for the purpose of playing Covered Games authorized by this Compact;
*626 P. "Revenue Share" means the periodic payment by the Tribe to the State provided for in Part XI of this Compact;
Q. "Revenue Sharing Cycle" means the annual (12-month) period of the Tribe's operation of Covered Games in its Facilities and whose first annual Cycle shall commence on the day the Tribe makes Covered Games available for public play in its Facilities;
R. "Rules and regulations" means the rules and regulations promulgated by the Commission for implementation of this Compact;
S. "State" means the State of Florida;
T. "State Compliance Agency" ("SCA") means the state agency that has the authority to carry out the State's oversight responsibilities under this Compact, which may be any agency designated by the Legislature for this purpose. The SCA shall be the Governor or his designee unless and until an SCA has been designated by the Legislature; provided, however, that nothing in this Compact is intended to empower the Governor to engage in any act not authorized by the Florida Constitution or Florida Statutes;
U. "Tribe" means the Seminole Tribe of Florida.

Part IV. AUTHORIZATION AND LOCATION OF COVERED GAMES
A. The Tribe and State agree that the Tribe is authorized to operate Covered Games on its Indian lands, as defined in the IGRA, in accordance with the provisions of this Compact. However, except for the provisions in Part XI (A) below, nothing in this Compact shall limit the Tribe's right to operate any game that is Class II under the IGRA.
B. The Tribe is authorized to conduct Covered Games under this Compact at only the following existing gaming Facilities on Tribal lands:
Seminole Indian CasinoBrighton
Highway 721Brighton Indian Reservation, Route 6 Box 611
Okeechobee, FL 34974
Seminole Indian CasinoCoconut Creek
5550 NW 40th St.
Coconut Creek, FL 33073
Seminole Indian CasinoHollywood
4150 N. St. Rd. 7
Hollywood, FL 33021
Seminole Indian CasinoImmokalee
506 S. 1st Street
Immokalee, FL 34142
Seminole Indian CasinoBig Cypress
30013 Josie Billie Hwy.
Clewiston, FL 33440
Seminole Hard Rock Hotel & CasinoHollywood
1 Seminole Way
Hollywood, FL 33314
*627 Seminole Hard Rock Hotel & CasinoTampa
5223 N. Orient Rd.
Tampa, FL 33610
C. Any of the identified Facilities in Section B (above) may be expanded or replaced by another Facility on the same reservation with advance notice to the State of sixty (60) calendar days, subject to the understanding that the number of existing Facilities on each reservation shall remain the same as provided in Section B (above).

Part V. RULES AND REGULATIONS; MINIMUM REQUIREMENTS FOR OPERATIONS
A. At all times during the Term of this Compact, the Tribe shall be responsible for all duties which are assigned to it and the Commission under this Compact. The Tribe shall promulgate any rules and regulations necessary to implement this Compact, which at a minimum shall expressly include or incorporate by reference all provisions of Part V of this Compact and the procedural requirements of Part VI of this Compact. Nothing in this Compact shall be construed to affect the Tribe's right to amend its rules and regulations, provided that any such amendment shall be in conformity with this Compact. The SCA may propose additional rules and regulations consistent with and related to the implementation of this Compact to the Commission at any time, and the Commission shall give good faith consideration to such suggestions and shall notify the SCA of its response or action with respect thereto.
B. All Facilities shall comply with, and all Covered Games approved under this Compact shall be operated in accordance with, the requirements set forth in this Compact, including, but not limited to, those set forth in Sections C and D of this Part and Appendix E. In addition, all Facilities shall be operated in strict compliance with tribal internal control standards that provide a level of control that equals or exceeds those set forth in the National Indian Gaming Commission's Minimum Internal Control Standards (25 C.F.R. Part 542) as set forth in detail in Appendix D, as the same may be amended or supplemented from time to time.
C. The Tribe and the Commission shall retain all records in compliance with the requirements set forth in Appendix F.
D. Compulsive Gambling.
The Tribe will continue and maintain its extensive and award-winning program to combat problem gambling and curtail compulsive gambling, including work with the Florida Council on Compulsive Gambling or other organization dedicated to assisting problem gamblers. The Tribe will continue to maintain the following safeguards against problem gambling.
1. The Tribe will provide a comprehensive training program designed in cooperation with the Florida Council on Compulsive Gambling (or other organization dedicated to assisting problem gamblers) to every new gaming employee.
2. The Tribe will make printed materials available to Patrons, which include contact information for the Florida Council on Compulsive Gambling 24-Hour Helpline (or other hotline dedicated to assisting problem gamblers), and will work with the Florida Council on Compulsive Gambling (or other organization dedicated to assisting problem gamblers) to provide contact information *628 for the Florida Council on Compulsive Gambling (or other organization dedicated to assisting problem gamblers), and to provide such information on the Facilities' internet website. The Tribe will continue to display all literature from the Florida Council on Compulsive Gambling (or other organization dedicated to assisting problem gamblers) within the Facilities.
3. The Commission shall establish a list of the Patrons voluntarily excluded from the Tribe's Facilities, pursuant to paragraph 5.
4. The Tribe shall employ its best efforts to exclude Patrons on such list from entry into its Facilities; provided that nothing in this Compact shall create for Patrons who are excluded but gain access to the Facilities, or any other person, a cause of action or claim against the State, the Tribe or the Commission or any other person, entity, or agency for failing to enforce such exclusion.
5. Patrons who believe they may be playing Covered Games on a compulsive basis may request that their names be placed on the list of the Patrons voluntarily excluded from the Tribe's Facilities.
6. All Covered Game employees shall receive training on identifying players who have a problem with compulsive gambling and shall be instructed to ask them to leave. Signs bearing a toll-free help-line number and educational and informational materials shall be made available at conspicuous locations and ATMs in each Facility, which aim at the prevention of problem gaming and which specify where Patrons may receive counseling or assistance for gambling problems. Nothing in this Section shall create for Patrons, or any other person, a cause of action or claim against the State, the Tribe or the Commission or any other person, entity, or agency for failing to identify a Patron or person who is a compulsive gambler and/or ask that person to leave.
7. The Tribe shall follow the rules for exclusion of Patrons set forth in Article XI of the Tribe's Gaming Code (Appendix I).
8. The Tribe shall make diligent efforts to prevent underage individuals from loitering in the area of each Facility where the Covered Games take place.
9. The Tribe shall assure that advertising and marketing of the Covered Games at the Facilities contain a responsible gambling message and a toll-free help-line number for problem gamblers, where practical, and that they make no false or misleading claims.
E. The State may secure an annual independent financial audit of the conduct of Covered Games subject to this Compact. The audit shall examine revenues in connection with the conduct of Covered Games and shall include only those matters necessary to verify the determination of Net Win and the basis of, and right to, the Payments made to the State pursuant to Part XI of this Compact and as defined by this Compact. A copy of the audit report for the conduct of Covered Games shall be submitted to the Commission within thirty (30) calendar days of completion. Representatives of the SCA may, upon request, meet with the Tribe and its auditors to discuss the audit or any matters in connection therewith; provided, such discussions are limited to Covered Games information. The annual independent financial audit shall be performed by an independent accounting firm, with experience in auditing casino operations, selected by the State, subject to the consent of the Tribe, which shall not be unreasonably *629 withheld. The Tribe shall pay the accounting firm for the costs of the annual independent financial audit.
F. Summaries of the rules for playing Covered Games and promotional contests shall be visibly displayed in the Facilities. Complete sets of rules shall be available in the Facilities upon request. Copies of all such rules shall be provided to the SCA within thirty (30) calendar days of their issuance or their amendment.
G. The Tribe shall provide the Commission and SCA with a chart of the supervisory lines of authority with respect to those directly responsible for the conduct of Covered Games, and shall promptly notify those agencies of any material changes thereto.
H. The Tribe engages in and shall continue to maintain proactive approaches to prevent improper alcohol sales, drunk driving, underage drinking, and underage gambling. These approaches involve intensive staff training and certification, Patron education, and the use of security personnel and surveillance equipment in order to enhance Patrons' enjoyment of the Facilities and provide for Patron safety. Staff training includes specialized employee training in nonviolent crisis intervention, driver's license verification and the detection of intoxication. Patron education is carried out through notices transmitted on valet parking stubs, posted signs in the Facilities and in brochures. Roving and fixed security officers, along with surveillance cameras, assist in the detection of intoxicated Patrons, investigate problems, and engage with Patrons to de-escalate volatile situations. To help prevent alcohol-related crashes, the Tribe operates the "Safe Ride Home Program," a free taxi service. Additionally, to reduce risks of underage gambling and underage drinking, the Tribe prohibits entry onto the casino floor of anyone under 18 years of age. The Tribe's programs and policies related to these matters are attached as Appendix P, and the Tribe shall maintain these (or stricter and/or more extensive) programs and policies for the duration of this Compact. The Tribe shall provide the State with written notice of any changes to the programs and policies in Appendix P, which notice shall include a copy of such changes and shall be sent on or before the effective date of the change. Nothing in this Section shall create for Patrons, or any other person, a cause of action or claim against the State, the Tribe or the Commission or any other person, entity, or agency for failing to fulfill the requirements of this Section.
I. No person under the age of twenty-one (21) shall be allowed to play Covered Games.
J. The Tribe may establish and operate Facilities that operate Covered Games only on its Indian lands as defined by the IGRA and as specified in Part IV of this Compact.
K. The Commission shall keep a record of, and shall report at least quarterly to the SCA, the number of Covered Games in each Facility, by the name or type of each and its identifying number.
L. The Tribe presently conducts and shall continue to conduct poker in each of its Facilities in compliance with provisions of Florida law, including provisions that limit wagers and pot sizes. However, the Tribe may hold up to six (6) celebrity/charity poker tournaments per year in each of its Facilities that are not subject to the limitations/restrictions imposed by Florida law, provided that a minimum of seventy percent (70%) of the Net Poker Income from each poker tournament is donated to a charitable organization organized pursuant to Section 501(c)(3) of the Internal Revenue Code. The maximum number of *630 days a celebrity/charity tournament will be played is eight (8) calendar days during the month a tournament is hosted. Any payments made to charitable organizations pursuant to this part shall not be calculated as Net Win for purpose of payments to the State under Part XI.
M. The Tribe and the Commission shall make available a copy of the following documents to any member of the public upon request: the minimum internal control standards of the NIGC; the Tribal gaming ordinance; this Compact; the rules of each Covered Game operated by the Tribe; and the administrative procedures for addressing Patron tort claims under Part VI.

PART VI. PATRON DISPUTES, TORT CLAIMS; PRIZE CLAIMS; LIMITED CONSENT TO SUIT
A. All disputes will be resolved in accordance with the procedures established in Article XI of the Tribe's Gaming Code (Appendix I).
B. Tort claims by employees of the Tribe's Facilities will be handled pursuant to the provisions of the Tribe's workers compensation ordinance, which shall provide workers the same or better protections as set forth in Florida's workers compensation laws. The Tribe's workers compensation ordinance is included as Appendix M.
C. Disputes by employees of the Tribe's Facilities will be handled pursuant to the provisions of the Tribe's policy for gaming employees, which is included in Appendix Q.
D. Tort remedies for Patrons.
1. A Patron who claims to have been injured in the area of the Facility where Covered Games are played is required to provide written notice to the Tribe's Risk Management Department or the Facility, in a reasonable and timely manner, but in no event later than six months after the date of the incident giving rise to the claimed injury occurs, or the claim shall be forever barred.
2. When the Tribe responds to an incident alleged to have caused a Patron's injury or illness, the Tribe shall provide a claim form to the Patron. It is the Patron's responsibility to complete the form and forward the form to the Tribe's Risk Management Department within a reasonable period of time, and in a reasonable and timely manner, but in no event later than six months after the date of the incident giving rise to the claimed injury occurs or the claim shall be forever barred.
3. Upon receiving written notification of the claim, the Tribe's Risk Management Department shall forward the notification to the Tribe's insurance carrier. The Tribe will use its best efforts to assure that the insurance carrier contacts the Patron within a reasonable period of time following receipt of the claim.
4. The insurance carrier will handle the claim to conclusion. If the Patron and the insurance carrier are not able to resolve the claim, the Patron may bring a tort claim against the Tribe in any court of competent jurisdiction in Broward County Florida, subject to the exhaustion of tribal remedies, as provided in this Compact, and subject to a four year statute of limitations, which shall begin to run from the date of the incident of the alleged claimed injury.
5. In no event shall the Tribe be deemed to have waived its tribal immunity from suit beyond $100,000.00 for an individual tort claim and $200,000.00 for the tort claims of all persons or entities claiming injury in tort arising out of a *631 single event or occurrence. These limitations are intended to include liability for compensatory and punitive damages, as applicable, as well as any costs, prejudgment interest and attorneys fees arising out of any claim brought or asserted against the Tribe, its subordinate governmental and economic units as well as any Tribal officials, employees, servants or agents in their official capacities.
6. Notices explaining the procedures and time limitations with respect to making a tort claim shall be prominently displayed in the Facilities, posted on the Tribe's website, and provided to any Patron for whom the Tribe has notice of the injury or property damage giving rise to the tort claim. Such notices shall explain the method and places for making a tort claim, that this procedure is the exclusive method of making a tort claim, and that claims that do not follow this procedure shall be forever barred.

Part VII. ENFORCEMENT OF COMPACT PROVISIONS
A. The Tribe and the Commission shall be responsible for regulating activities pursuant to this Compact. As part of its responsibilities, the Tribe has adopted or issued standards designed to ensure that the Facilities are constructed, operated and maintained in a manner that adequately protects the environment and public health and safety. Additionally, the Tribe and the Commission shall ensure that:
1. Operation of the conduct of Covered Games is in strict compliance with (i) the gaming ordinance duly adopted by the Tribe and approved in accordance with the IGRA, (ii) all rules, regulations, procedures, specifications, and standards lawfully adopted by the National Indian Gaming Commission and the Commission, and (iii) the provisions of this Compact, including, but not limited to, the standards and the Tribe's rules and regulations set forth in the Appendices;
2. Reasonable measures are taken to:
(a) assure the physical safety of Facility Patrons, employees, and any other person while in the Facility;
(b) prevent illegal activity at the Facilities or with regard to the operation of Covered Games, including, but not limited to, the maintenance of employee procedures and a surveillance system;
(c) ensure prompt notification is given to appropriate law enforcement authorities of persons who may be involved in illegal acts in accordance with applicable law;
(d) ensure that the construction and maintenance of the Facilities comply with the standards of the Florida Building Code, the provisions of which the Tribe has adopted as the Seminole Tribal Building Code (Appendix K);
(e) ensure adequate emergency access plans have been prepared to ensure the health and safety of all Covered Game Patrons (Appendix J);
B. All licenses for members and employees of the Commission shall be issued according to the same standards and terms applicable to Facility employees. The Commission's compliance officers shall be independent of the Tribal gaming operations, and shall be supervised by and accountable only to the Commission. A Commission compliance officer shall be available to the Facility during all hours of operation upon reasonable notice, and shall have immediate access to any and all areas of the Facility for the purpose of ensuring compliance with the provisions of this Compact. The Commission shall investigate any such suspected or reported violation of this Part and shall officially enter into its files timely written reports of investigations *632 and any action taken thereon, and shall forward copies of such investigative reports to the SCA within thirty (30) calendar days of such filing. The scope of such reporting shall be determined by a Memorandum of Understanding between the Commission and the SCA as soon as practicable after the Effective Date of this Compact. Any such violations shall be reported immediately to the Commission, and the Commission shall immediately forward the same to the SCA. In addition, the Commission shall promptly report to the SCA any such violations which it independently discovers.
C. In order to develop and foster a positive and effective relationship in the enforcement of the provisions of this Compact, representatives of the Commission and the SCA shall meet, not less than on an annual basis, to review past practices and examine methods to improve the regulatory scheme created by this Compact. The meetings shall take place at a location mutually agreed to by the Commission and the SCA. The SCA, prior to or during such meetings, shall disclose to the Commission any concerns, suspected activities, or pending matters reasonably believed to possibly constitute violations of this Compact by any person, organization or entity, if such disclosure will not compromise the interest sought to be protected.

Part VIII. STATE MONITORING OF COMPACT
A. The SCA may, pursuant to the provisions of this Compact, monitor the conduct of Covered Games to ensure that the Covered Games are conducted in compliance with the provisions of this Compact. In order to properly monitor the conduct of Covered Games, agents of the SCA without prior notice shall have reasonable access to all public areas of the Facilities related to the conduct of Covered Games as provided herein.
1. While the Commission will act as the regulator of the Facilities, the SCA may take reasonable steps to assure that operations at the Facilities comply with the terms of this Compact and may advise on such issues as it deems appropriate.
2. In order to fulfill its oversight responsibilities, the State has identified specific oversight testing procedures, set forth below in paragraph 3, subsections (a)(b) and (c), which the SCA may perform on a routine basis.
3. (a) The SCA may inspect any Covered Games in operation at the Facilities on a random basis not to exceed four (4) times annually at each Facility to confirm that the Covered Games operate and play properly pursuant to the manufacturer's technical standards. Such random inspections shall occur during normal business hours. The SCA shall provide notice to the Commission of such inspection at or prior to the commencement of the random inspections, and a Commission agent may accompany the inspection.
(b) For each Facility, the SCA may perform one annual review of the slot machine compliance audit.
(c) At least on an annual basis, the SCA may meet with the Tribe's Internal Audit Department for Gaming to review internal controls and violations of same by the Facilities.
4. The SCA will seek to work with and obtain the assistance of the Commission in the resolution of any conflicts with the management of the Facilities, and the State and the Tribe shall make their best efforts to resolve disputes through negotiation whenever possible. Therefore, in order to foster a spirit of cooperation and efficiency, the parties *633 hereby agree that when disputes arise between the SCA staff and Commission regulators from the day-to-day regulation of the Facilities, they should generally be resolved first through meeting and conferring in good faith. This voluntary process does not proscribe the right of either party to seek other relief that may be available when circumstances require such relief. In the event of a dispute or disagreement between Tribal and SCA regulators, the dispute or disagreement shall be resolved in accordance with the dispute resolution provisions of Part XIII of this Compact;
5. Access to each Facility by the SCA shall be during the Facility's normal operating hours only, provided that to the extent such inspections are limited to areas of the Facility where the public is normally permitted, the SCA agents may inspect the Facility without giving prior notice to the Tribe or the Commission;
6. Any suspected or claimed violations of this Compact or law shall be directed in writing to the Commission; the SCA agents, in conducting the functions assigned them under this Compact, shall not unreasonably interfere with the functioning of any Facility; and
7. Before the SCA agents enter any nonpublic area of a Facility, they shall provide proper prior notice and photographic identification to the Commission. The SCA agents shall be accompanied in nonpublic areas of the Facility by a Commission officer. Notice of at least two (2) hours by the SCA to the Commission is required to assure that a Commission officer is available to accompany the SCA agents at all times.
B. Subject to the provisions herein, agents of the SCA shall have the right to review and request copies of documents of the Facility related to its conduct of Covered Games. The review and copying of such documents shall be during normal business hours unless otherwise allowed by the Tribe at the Tribe's discretion. The Tribe cannot refuse said inspection and copying of such documents, provided that the inspectors cannot require copies of documents in such volume that it unreasonably interferes with the normal functioning of the Facilities or Covered Games.
To the extent that the Tribe provides the State with information which the Tribe claims to be confidential and proprietary, or a trade secret, the Tribe shall clearly mark such information with the following designation: "Trade Secret, Confidential and Proprietary." If the State receives a request under chapter 119, Florida Statutes that would include such designated information, the State shall promptly notify the Tribe of such a request and the Tribe shall promptly notify the State about its intent to seek judicial protection from disclosure. Upon such notice from the Tribe, the State shall not release the requested information until a judicial determination is made. This designation and notification procedure does not excuse the State from complying with the requirements of the State's public records law, but is intended to provide the Tribe the opportunity to seek whatever judicial remedy it deems appropriate. Notwithstanding the foregoing procedure, the SCA may provide copies of tribal documents to federal law enforcement and other State agencies or State consultants that the State deems reasonably necessary in order to conduct or complete any investigation of suspected criminal activity in connection with the Tribe's Covered Games or the operation of the Facilities or in order to assure the Tribe's compliance with this Compact.
*634 C. At the completion of any SCA inspection or investigation, the SCA may forward a written report thereof to the Commission, containing all pertinent, nonconfidential, nonproprietary information regarding any violation of applicable laws or this Compact which was discovered during the inspection or investigation unless disclosure thereof would adversely impact an investigation of suspected criminal activity. Nothing herein prevents the SCA from contacting tribal or federal law enforcement authorities for suspected criminal wrongdoing involving the Commission.
D. Except as expressly provided in this Compact, nothing in this Compact shall be deemed to authorize the State to regulate the Tribe's government, including the Commission, or to interfere in any way with the Tribe's selection of its governmental officers, including members of the Commission.

Part IX. JURISDICTION
The obligations and rights of the State and the Tribe under this Compact are contractual in nature, and this Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction in any way.

Part X. LICENSING
The Tribe and the Commission shall comply with the licensing and hearing requirements set forth in 25 C.F.R. Part 556 and Part 558, as well as the applicable licensing and hearing requirements set forth in Articles IV-VI of the Tribe's Gaming Code (Appendix I).

Part XI. PAYMENTS TO THE STATE OF FLORIDA
A. The parties acknowledge and recognize that this Compact provides the Tribe with partial but substantial exclusivity and other valuable consideration consistent with the goals of the IGRA, including special opportunities for tribal economic development through gaming within the external boundaries of Florida with respect to the play of Covered Games. In consideration thereof, the Tribe covenants and agrees, subject to the conditions agreed upon in Part XII of this Compact, to make Payments to the State derived from Net Win as set forth in Exhibit A (Payment Schedule). The Tribe further agrees to convert eighty percent (80%) of its Class II video bingo terminals (or their equivalents) to Class III slot machines within forty-eight (48) months from the Effective Date of this Compact. Within sixty (60) months from the Effective Date of this Compact, all Class II video bingo terminals (or their equivalents) shall be converted to Class III slot machines, or the Payment to the State shall be calculated as if the conversion has been completed, whether or not the Tribe has fully executed its conversion. The Tribe further agrees that it will not purchase or lease any new Class II video bingo terminals (or their equivalents) after the Effective Date of this Compact.
B. Payments pursuant to Section A above shall be made to the State via electronic funds transfer in a manner directed by the SCA. Payments will be due in accordance with the Payment Schedule set forth in Exhibit A. The appropriation of any Payments received by the State pursuant to this Compact lies within the exclusive prerogative of the Legislature. The Governor, however, recognizes that the operation of the Florida Lottery and the operation of slot machines in the pari-mutuel facilities in Broward County have provided the State an opportunity to increase and enhance the dollars available to spend on the education of Florida's children. Recognizing the importance of *635 those benefits while also taking into account the local impact from the operation of Covered Games at the Facilities, the Governor recommends that (1) ninety-five percent (95%) of these Payments received by the State be appropriated to the State's Educational Enhancement Trust Fund and (2) five percent (5%) of these Payments received by the State be distributed, as provided for by the Legislature, to those local governments (including both counties and municipalities) in Florida affected by the Tribe's operation of Covered Games.
C. The Annual Oversight Assessment to reimburse the State for the actual costs of the operation of the SCA to perform its monitoring functions as defined in this Compact shall be determined and paid in quarterly installments within thirty (30) calendar days of receipt by the Tribe of an invoice from the SCA. The Tribe reserves the right to audit the invoices on an annual basis, a copy of which will be provided to the SCA, and any discrepancies found therein shall be reconciled within forty-five (45) calendar days of receipt of the audit by the SCA. Out-of-pocket expenses to be incurred by the Governor or his designee performing functions of the SCA unless and until the SCA is designated by the Legislature shall be advanced by the Tribe upon submission of properly documented requests.
D. Except as expressly provided in this Part, nothing in this Compact shall be deemed to require the Tribe to make payments of any kind to the State or any of its agencies.

Part XII. REDUCTION OF TRIBAL PAYMENTS BECAUSE OF LOSS OF EXCLUSIVITY OR OTHER CHANGES IN FLORIDA LAW
The intent of this section is to provide the Tribe with the right to operate Covered Games on an exclusive basis throughout the State, subject to the exceptions and provisions set forth below.
A. If Class III gaming as defined in this Compact, or other casino-style gambling where the results of such games are determined through the use of a random number generator, that is not presently authorized by or under Florida law is authorized for any location within the State of Florida that is under the jurisdiction of the State, including but not limited to (1) electronically-assisted bingo or pull-tab games or (2) video lottery terminals (VLTs) or any similar games that allow direct operation of the games by customers of the Florida Lottery, any successor entity or any licensee of the Florida Lottery or any successor entity, and such gambling begins to be offered for public or private use, the Payments due the State pursuant to Parts XI.A and B of this Compact shall cease until such gambling is no longer operated, in which event the Payments due the State pursuant to Parts XI.A and B of this Compact shall resume.
B. Exceptions: The following are exceptions to the exclusivity provisions of Section A above.
1. Any Class III gaming authorized by a compact between the State and any other federally recognized tribe pursuant to IGRA will not be a breach or other violation of the exclusivity provisions set forth in Section A above.
2. (a) If a local referendum is passed by the voters of Miami-Dade County implementing the authority for operation of slot machines by pari-mutuels located within that County and after any pari-mutuel in that County begins to offer slot machine play or,
(b) if at any time there is an expansion of Class III gaming in either Broward or Miami-Dade Counties,
*636 and
(c) the Tribe's annual Net Win plus revenues from its remaining Class II video bingo terminals (or their equivalents) within its Facilities statewide drops below $1.37 billion, the Payments due the State pursuant to Part XI. Sections A and B of this Compact shall cease. If the Tribe's annual Net Win plus revenues from its remaining Class II video bingo terminals (or their equivalents) within its Facilities statewide again reaches or exceeds $1.37 billion, the Payments due the State pursuant to Part XI, Sections A and B of this Compact shall resume, but may be reduced again under the provisions set forth above.
3. The conduct of illegal or otherwise unauthorized Class III gaming within the State shall not be considered a breach or other violation of the exclusivity provisions set forth in Section A above, unless such gaming is conducted in multiple locations in more than one county and its operation is sanctioned, tacitly or otherwise, by action or inaction of State and/or local officials if, after notice from the Tribe to the SCA, the State has evidenced a lack of good faith and failed to take reasonable measures to stop the conduct of illegal gaming activities.
C. To the extent that the exclusivity provisions of this Part are breached or otherwise violated and the Tribe's ongoing Payment obligations to the State pursuant to Part XI, Sections A and B of this Compact cease, any outstanding Payments that would have been due the State from the Tribe's Facilities prior to the breach/violation shall be made within thirty (30) business days after the breach/violation.
D. The breach of this Part's exclusivity provisions and the cessation of Payments pursuant to Part XI, Sections A and B of this Compact shall not excuse the Tribe from continuing to comply with all other provisions of this Compact, including continuing to pay the State the Annual Oversight Assessment as set forth in Part XI, Section C of this Compact.
E. Nothing in this Compact is intended to affect the ability of the State Legislature to enact laws either further restricting or expanding gambling on non-tribal lands.

Part XIII. DISPUTE RESOLUTION
In the event that either party to this Compact believes that the other party has failed to comply with any requirements of this Compact, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Compact, the goal of the Parties is to resolve all disputes amicably and voluntarily whenever possible. In pursuit of this goal, the following procedures may be invoked:
A. A party asserting noncompliance or seeking an interpretation of this Compact first shall serve written notice on the other party. The notice shall identify the specific Compact provision alleged to have been violated or in dispute and shall specify in detail the asserting party's contention and any factual basis for the claim. Representatives of the Tribe and State shall meet within thirty (30) calendar days of receipt of notice in an effort to resolve the dispute, unless they mutually agree to extend this period;
B. A party asserting noncompliance or seeking an interpretation of this Compact under this Section shall be deemed to have certified that to the best of the party's knowledge, information, and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Compact is warranted and made in good faith and not for any improper purpose, such as to harass or to cause *637 unnecessary delay or the needless incurring of the cost of resolving the dispute;
C. If the parties are unable to resolve a dispute through the process specified in Sections A and B of this Part, either party can call for mediation under the Commercial Mediation Procedures of the American Arbitration Association (AAA), set forth as Appendix R, or any such successor procedures, provided that such mediation does not last more than sixty (60) calendar days, unless an extension to this time limit is negotiated by the parties. The disputes available for resolution through mediation are limited to matters arising under the terms of this Compact and its Appendices;
D. If the parties are unable to resolve a dispute through the process specified in Sections A, B, and C of this Part, notwithstanding any other provision of law, the State may bring an action against the Tribe in federal district court ("federal court") regarding any dispute arising under this Compact in a district in which the federal court has venue. If the federal court declines to exercise jurisdiction, or federal precedent exists that rules that the federal court would not have jurisdiction over such a dispute, the State may bring the action in the Courts of the Seventeenth Judicial Circuit in and for Broward County, Florida. The State is entitled to all rights of appeal permitted by law in the court system in which the action is brought.
E. For purposes of actions based on disputes between the State and the Tribe that arise under this Compact and the enforcement of any judgment resulting therefrom, the Tribe expressly waives its right to assert sovereign immunity from suit and from enforcement of any ensuing judgment, and further consents to be sued in federal or state court, including the rights of appeal specified above, as the case may be, provided that (i) the dispute is limited solely to issues arising under this Compact, (ii) there is no claim for monetary damages (except that payment of any money required by the terms of this Compact, as well as injunctive relief or specific performance enforcing a provision of this Compact requiring the payment of money to the State may be sought), and (iii) nothing herein shall be construed to constitute a waiver of the sovereign immunity of the Tribe with respect to any third party that is made a party or intervenes as a party to the action. In the event that intervention, joinder, or other participation by any additional party in any action between the State and the Tribe would result in the waiver of the Tribe's sovereign immunity as to that additional party, the waiver of the Tribe provided herein may be revoked.
F. The State may not be precluded from pursuing any mediation or judicial remedy against the Tribe on the grounds that the State has failed to exhaust its Tribal administrative remedies.
G. Notwithstanding anything to the contrary in this Part, any failure of the Tribe to remit the Payments pursuant to the terms of Part XI will entitle the State to seek injunctive relief in federal or state court, at the State's election, to compel the Payments after exhausting the dispute resolution process in Sections A and B of this Part.
H. If the parties are unable to resolve a dispute involving a claim by the Tribe against the State through the process specified in Sections A, B, and C of this Part, notwithstanding any other provision of law, the Tribe may invoke arbitration of the dispute under the Commercial Arbitration Rules of the American Arbitration Association as set forth in Appendix S. The arbitrators' decision may not be enforced in any court. If the arbitrators find that the State is not in compliance with the *638 Compact, the State shall have the opportunity to challenge the decision of the arbitrators by bringing an independent action against the Tribe in federal district court ("federal court") regarding the dispute underlying the arbitration in a district in which the federal court has venue. If the federal court declines to exercise jurisdiction, or federal precedent exists that rules that the federal court would not have jurisdiction over such a dispute, the State may bring the action in the Courts of the Seventeenth Judicial Circuit in and for Broward County, Florida. The State is entitled to all rights of appeal permitted by law in the court system in which the action is brought. The State shall be entitled to de novo review of the arbitrators' decision under this Section. For the purpose of this Section, the Tribe agrees to waive its immunity as provided in Section E of this Part.
I. If the arbitrators find that the State is not in compliance with the Compact and the State fails to file suit as provided above within sixty (60) calendar days of the arbitrators' decision or fails to maintain the suit through final judgment, including appeals, without the agreement of the Tribe, the Tribe may suspend Payment under Part XI until the State comes into compliance with the arbitrators' decision.
J. If the State files suit as provided above and a final judgment is rendered by the court, the failure of the State to comply with the judgment shall constitute grounds for the Tribe to suspend Payment under Part XI until the State comes into compliance with the court's judgment.

PART XIV. CONSTRUCTION OF COMPACT; SEVERANCE; FEDERAL APPROVAL
A. Each provision, section, and subsection of this Compact shall stand separate and independent of every other provision, section, or subsection. In the event that a federal district court in Florida or other court of competent jurisdiction shall find any provision, section, or subsection of this Compact to be invalid, the remaining provisions, sections, and subsections of this Compact shall remain in full force and effect, provided that severing the invalidated provision, section or subsection does not undermine the overall intent of the parties in entering into this Compact. However, if either Part III(E), Part XI or Part XII is held by a court of competent jurisdiction to be invalid, this Compact will become null and void. If any provision, section, or subsection of this Compact is determined by a federal district court in Florida or other court of competent jurisdiction to impose a mandatory duty on the State of Florida that requires authorization by the Florida Legislature, the duty conferred by that particular provision, section or subsection shall no longer be mandatory but will be deemed to be a matter within the discretion of the Governor or other State officers, subject to such legislative approval as may be required by Florida law.
B. It is understood that Part XII of this Compact, which provides for a cessation of the Payments to the State under Part XI, does not create any duty on the State of Florida but only a remedy for the Tribe if gambling under state jurisdiction is expanded.
C. This Compact is intended to meet the requirements of the IGRA as it reads on the Effective Date of this Compact, and where reference is made to the IGRA, or to an implementing regulation thereof, the reference is deemed to have been incorporated into this document as if set in full. Subsequent changes to the IGRA that diminish the rights of the State or Tribe may not be applied retroactively to alter the terms of this Compact, except to the *639 extent that Federal law validly mandates that retroactive application without the respective consent of the State or Tribe.
D. Neither the presence in another State/Tribal compact of language that is not included in this Compact, nor the absence in this Compact of language that is present in another State/Tribal compact shall be a factor in construing the terms of this Compact.
E. Each party hereto agrees to defend the validity of this Compact.
F. The parties shall cooperate in seeking approval of this Compact from the Secretary of the Interior and the parties further agree that, upon execution, the Tribe shall submit the Compact to the Secretary forthwith.

Part XV. NOTICES
All notices required under this Compact shall be given by (i) certified mail, return receipt requested, (ii) commercial overnight courier service, or (iii) personal delivery, to the following persons:
 Governor
 The Capitol
 Tallahassee, Florida 32301
 General Counsel to the Governor
 The Capitol
 Tallahassee, Florida 32301
 Chairman
 Seminole Tribe of Florida
 6300 Stirling Road
 Hollywood, Florida 33024
 General Counsel
 Seminole Tribe of Florida
 6300 Stirling Road
 Hollywood, Florida 33024

PART XVI. EFFECTIVE DATE & TERM
A. This Compact shall become effective upon its approval by the Secretary of the Interior as a tribal-state compact within the meaning of the IGRA either by publication of the notice of approval in the Federal Register or by operation of law under 25 U.S.C. § 2710(d)(7)(C).
B. This Compact shall have a term of 25 years (300 months) beginning on the first day of the month following the month in which the Compact becomes effective under Section A of this Part. This Compact shall remain in full force and effect until the sooner of expiration of its terms or until terminated by mutual agreement of the parties.

PART XVII. AMENDMENT OF COMPACT AND APPENDICES
Amendment of this Compact may only be made by written agreement of the parties, subject to approval by the Secretary either by publication of the notice of approval in the Federal Register or by operation of law under 25 U.S.C. § 2710(d)(7)(C). Changes in the provisions of tribal ordinances, regulations and procedures set forth in the Appendices to this Compact may be made by the Tribe with thirty (30) calendar days advance notice to the State. If the State has an objection to any change to the tribal ordinance, regulation or procedure which is the subject of the notice on the ground that its adoption would be a violation of the Tribe's obligations under this Compact, the State may invoke the dispute resolution provisions provided in Part XIII of this Compact.

PART XVIII. MISCELLANEOUS
A. Except to the extent expressly provided in this Compact, this Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.
*640 B. If, after the Effective Date of this Compact, the State enters into a Compact with any other Tribe that contains more favorable terms with respect to any of the provisions of this Compact and the U.S. Secretary of the Interior approves such compact, either by publication of the notice of approval in the Federal Register or by operation of law under 25 U.S.C. § 2710(d)(7)(C), upon tribal notice to the State and the Secretary, this Compact shall be deemed amended to contain the more favorable terms, unless the State objects to the change and can demonstrate, in a proceeding commenced under Part XIII, that the terms in question are not more favorable.
C. Upon the occurrence of certain events beyond the Tribe's control, including acts of God, war, terrorism, fires, floods, or accidents causing damage to or destruction of one or more of its Facilities or property necessary to operate the Facility(ies), (i) the Tribe's obligation to pay the Guaranteed Minimum Payment described in Part XI shall be reduced pro rata to reflect the percentage of the total Net Win lost to the Tribe from the impacted Facility(ies) and (ii) the Net Win specified under Part XII, section B, for purposes of determining whether the Tribe's Payments described in part XI shall cease, shall be reduced pro rata to reflect the percentage of the total Net Win lost to the Tribe from the impacted Facility(ies), with the proviso that if Payments to the State have already stopped under the provisions of Part XII, section B, the provisions of this Section shall not trigger a resumption of payments under that Part. The foregoing shall not excuse any obligations of the Tribe to make Payments to the State as and when required hereunder or in any related document or agreement.
D. Smoking
The Tribe and the State recognize that opportunities to engage in gaming in smoke-free or reduced-smoke environments provides both health and other benefits to Patrons, and the Tribe has already instituted a non-smoking section at its Seminole Hard Rock Hotel & Casino Hollywood Facility. As part of its continuing commitment to this issue, the Tribe will:
1. install and utilize a ventilation system at all new construction at its Facilities, which system exhausts tobacco smoke to the extent reasonably feasible under existing state-of-the-art technology;
2. designate a smoke-free area for slot machines at all new construction at its Facilities; and
3. install non-smoking, vented tables for table games installed in its Facilities sufficient to reasonably respond to demand for such tables.
E. The annual average minimum pay-out of all slot machines in each Facility shall not be less than eighty-five percent (85%).
F. Nothing in this Compact shall alter any of the existing memoranda of understanding, contracts, or other agreements entered into between the Tribe and any other federal, state, or local governmental entity.
G. Fair Employment Practices
The Tribe currently has as set forth in Appendix Q, and agrees to maintain, standards that are comparable to the standards provided in federal laws and State laws forbidding employers from discrimination in connection with the employment of persons working at the Facilities on the basis of race, color, religion, national origin, gender, age, disability/handicap, or marital status. Nothing herein shall preclude the Tribe from giving preference in *641 employment, promotion, seniority, lay offs or retention to members of the Tribe and other federally recognized tribes.

PART XIX. EXECUTION
By signing this Compact, the Governor of the State of Florida affirms that he has authority to act for the State in this matter and no further action by the State or any State official is necessary for this Compact to take effect upon approval by the Secretary of the Interior and publication of the notice of approval in the Federal Register or by operation of law under 25 U.S.C. § 2710(d)(7)(C). The Governor also affirms that he will take all appropriate steps to effectuate its purposes and intent. The undersigned Chairman of the Tribal Council of the Seminole Tribe of Florida affirms that he is duly authorized and has the authority to execute this Compact on behalf of the Tribe. The Chairman also affirms that he will take all appropriate steps to effectuate its purposes and intent.
APPROVED:
State of Florida
______________________________ Date: November 14, 2007
Charlie Crist
Governor
Seminole Tribe of Florida
_______________________________ Date: November 14, 2007
Mitchell Cypress
Chairman of the Tribal Council

Exhibit A

Payment Schedule
Subject to the provisions in Part XI of the Compact, and subject to the limitations agreed upon in Part XII of the Compact, the amounts paid by the Tribe to the State shall be calculated as follows:
(a) Upon the Effective Date of this Compact, the Tribe will pay to the State a sum of Fifty Million Dollars ($50,000,000), as an advance against the Guaranteed Payment of One Hundred Million Dollars ($100,000,000) from the first Revenue Sharing Cycle.
(b) For the first Revenue Sharing Cycle, the Tribe shall pay an additional Fifty Million Dollars ($50,000,000). Twenty-Five Million Dollars ($25,000,000) of that amount shall be paid in equal installments over the course of the twelve (12) months of the first Revenue Sharing Cycle, and the remaining Twenty-five Million Dollars ($25,000,000) shall be paid in equal installments over the course of the twelve (12) months of the second Revenue Sharing Cycle.
(c) For the second Revenue Sharing Cycle, in addition to the carry-over payments from the first Revenue Sharing Cycle, *642 the Tribe shall pay One Hundred and Twenty-Five Million Dollars ($125,000,000) in equal installments over the course of the twelve (12) months of the second Revenue Sharing Cycle.
(d) For the third Revenue Sharing Cycle, the Tribe shall guarantee a minimum Payment of not less than One Hundred and Fifty Million Dollars ($150,000,000), if the Revenue Share calculated for that Revenue Sharing Cycle under Section (g), below, is less than the Guaranteed Minimum Payment.
(e) For every subsequent Revenue Sharing Cycle, the Tribe agrees to pay not less than a Guaranteed Minimum Payment of One Hundred Million Dollars ($100,000,000.00) if the Revenue Share calculated for that Revenue Sharing Cycle under Section (g), below, is less than the Guaranteed Minimum Payment.
(f) All Guaranteed Minimum Payments shall be deducted from and credited toward the Revenue Share in each Revenue Sharing Cycle set forth below in Section (g).
(g) For the third through twenty-fifth Revenue Sharing Cycles, to the extent that the Revenue Share exceeds the Guaranteed Minimum Payment for each Revenue Sharing Cycle, the Tribe agrees, as further provided in Section (h), to pay a Revenue Share for that Revenue Sharing Cycle equal to the total amount calculated pursuant to this Section as follows:
(i) Ten percent (10%) of all amounts up to Two Billion Dollars ($2,000,000,000) of Net Win received by the Tribe from the operation and play of Covered Games from each Revenue Sharing Cycle;
(ii) Twelve percent (12%) of all amounts between Two Billion and One Dollar ($2,000,000,001) and Two and one half Billion Dollars ($2,500,000,000) of Net Win received by the Tribe from the operation and play of Covered Games from each Revenue Sharing Cycle;
(iii) Fifteen percent (15%) of all amounts between Two and one half Billion and One Dollars ($2,5000,000,001) and Three Billion Dollars ($3,000,000,000) of Net Win received by the Tribe from the operation and play of Covered Games from each Revenue Sharing Cycle;
(iv) Twenty percent (20%) of all amounts between Three Billion and One Dollar ($3,000,000,001) and Four Billion Dollars ($4,000,000,000) of Net Win received by the Tribe from the operation and play of Covered Games from each Revenue Sharing Cycle;
(v) Twenty-two and one half (22.5%) of all amounts between Four Billion and One Dollar ($4,000,000,001) and Four and one half Billion Dollars ($4,500,000,000) of Net Win received by the Tribe from the operation and play of Covered Games from each Revenue Sharing Cycle;
(vi) Twenty-five percent (25%) of all amounts over Four and one half Billion Dollars ($4,500,000,000) of Net Win received by the Tribe from the operation and play of Covered Games from each Revenue Sharing Cycle.
(h) Monthly Payment
(i) On or before the fifteenth (15th) day of the month following the first month of the Revenue Sharing Cycle, the Tribe will remit to the State the greater amount of eight and one-third percent (8.3%) of the estimated annual Revenue Share or eight and one-third percent (8.3%) of the Guaranteed Minimum Payment ("the monthly payment").
(ii) The Tribe will make available to the State at the time of the monthly *643 payment the basis for the calculation of the Payment.
(iii) Each month the Tribe will internally "true up" the calculation of the estimated Revenue Share based on the Tribe's un-audited financial statements related to Covered Games.
(i) Payment Verification
(i) On or before the Forty-fifth (45th) day after the third month, sixth month, ninth month, and twelfth month of Revenue Sharing Cycles three through twenty-five (provided that the twelve (12) month period does not coincide with the Tribe's fiscal year end date as indicated in subsection (iii) below), the Tribe will provide the State with an audit report by its independent auditors as to the accuracy of the annual Revenue Share calculation.
(ii) For each quarter of these Revenue Sharing Cycles the Tribe agrees to engage its independent auditors to conduct a review of the un-audited net revenue from Covered Games. On or before the one hundred and twentieth (120th) day after the end of the Tribe's fiscal year, the Tribe agrees to require its independent auditors to provide an audit report to verify Net Win for Covered Games and the related Payment of the annual Revenue Share to the SCA for State review.
(iii) If the twelfth (12th) month of the Revenue Sharing Cycle does not coincide with the Tribe's fiscal year, the Tribe agrees to require its independent auditors to deduct Net Win from Covered Games for any of the months that are outside of the Revenue Sharing Cycle and to include Net Win from Covered Games for those months which fall outside of the Tribe's audit period but fall within the Revenue Sharing Cycle, prior to issuing the audit report.
(iv) No later than thirty (30) calendar days after the day the audit report is issued, the Tribe will remit to the State any underpayment of the annual Revenue Share, and the State will either reimburse to the Tribe any overpayment of the annual Revenue Share or authorize the overpayment to be deducted from the next monthly payment.
NOTES
[1] During this period, two separate but identical bills designating the Governor to negotiate and execute a compact and submit it for ratification by the legislature were not voted on by the House of Representatives. See Fla. SB 160 (2007); Fla. HB 209 (2007).
[2] We also allowed other organizations to file briefs as amici curiae in support of the House: the Florida Senate, the Gulfstream Park Racing Association, and the City of Hallandale Beach.
[3] The federal district court, however, concluded that such approval did render the Tribe's suit moot. Seminole Tribe of Fla. v. United States, No. 07-60317-CIV (S.D. Fla. order filed June 20, 2008). The court dismissed the Tribe's case and noted that the Tribe already had begun operating under the Compact's terms.
[4] For example, Part V provides that the Tribe will establish rules, regulations, and minimum operational requirements of gaming facilities under the Compact. The "State Compliance Agency"which is earlier defined as "the Governor or his designee unless and until an SCA has been designated by the Legislature," see Compact at 7"may propose additional rules and regulations consistent with and related to the implementation of this Compact...." Compact at 9. In addition, "the State may secure an annual independent financial audit of the conduct of Covered Games subject to this Compact," may request meetings with the Tribe regarding the audit, and may select the independent auditor. Compact at 11-12. Part VI addresses tort claims and remedies for patrons and provides that employee claims will be addressed under the Tribe's workers' compensation regulation. Compact at 15. Part VII places regulation of the activities governed by the Compact exclusively with the Tribe. Compact at 17. Part VIII addresses the State's power, through the State Compliance Agency, to monitor the gaming, specifying the terms for the Agency's visits to gaming facilities. Compact at 19.
[5] IGRA lists several permissible subjects for negotiation:

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
(v) remedies for breach of contract;
(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
(vii) any other subjects that are directly related to the operation of gaming activities.
25 U.S.C. § 2710(d)(3)(C).
[6] IGRA contains a solitary reference to a state's governorin an unrelated section addressing the Secretary's authority to permit gaming on specific lands. See 25 U.S.C. § 2719. Congress knew how to refer to a "governor" when it wanted to do so.
[7] We note that the Governor relies on Dewberry v. Kulongoski, 406 F.Supp.2d 1136 (D.Or. 2005), in which Oregon citizens argued that the governor lacked authority to bind the state to an IGRA compact. Despite dismissing the case on procedural grounds, the judge noted that a state constitutional provision conferring authority on the governor to "transact all necessary business with the officers of government" authorized the governor to execute the gaming compact. Id. at 1154-55. We do not find this dictum persuasive. Id. at 1142.
[8] The House argues that the Compact significantly changes Florida law and policy in a number of ways: it authorizes Class III slot machines outside of Broward County; it allows blackjack and other banked card games that are currently illegal throughout Florida; it provides for collection of funds from tribal casinos for State purposes under a revenue-sharing agreement and penalizes the State for any expansion of non-tribal gaming; it allows an exception to Florida's substantive right of access to public records for information dealing with Indian gaming; it changes the venue of litigation dealing with individual disputes with the tribal casinos; it sets procedures for tort remedies occurring in certain circumstances; it waives sovereign immunity to the extent that it creates enforceable contract rights between the State and the Tribe; and it establishes a regulatory mechanism to be undertaken by the Governor or his designee. Because of our resolution of this case, we need not consider whether these other provisions encroach on the legislature's policy-making authority.
[9] Chapter 849, Florida Statutes (2007), regulates most gaming. It prohibits playing "any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value," designating it a second-degree misdemeanor. § 849.08, Fla. Stat. (2007). Certain "penny-ante games" are exempted when "conducted strictly in accordance" with the law. § 849.085, Fla. Stat. (2007) ("`Penny-ante game' means a game or series of games of poker, pinochle, bridge, rummy, canasta, hearts, dominoes, or mah-jongg in which the winnings of any player in a single round, hand, or game do not exceed $10 in value.").
[10] Since the majority assumes that we possess quo warranto jurisdiction, I address the merits of this case; however, I am concerned that we may lack quo warranto jurisdiction to address the issue as reframed by the majority.
[11] Through the IGRA, Congress neither claims tonor may itdetermine who possesses the power to act on behalf of the State of Florida. The State is not an independent sentient beingit may only act through its officers. The fact that the IGRA consistently refers to "the State" when addressing the negotiation of compacts, does not foreclose state law from enabling the Governor to so negotiate. The issue of who may act on behalf of the State of Florida is an issue of state law, not federal law. Therefore, interpretation of the IGRA's use of the noun "the State" is not a proper means of determining whether the Governor may negotiate and consummate inter-sovereign compacts under the necessary-business clause of the Florida Constitution. See art. IV, § 1(a), Fla. Const. Compare Dewberry, 406 F.Supp.2d at 1154-55 (finding that the governor was a proper state officer to negotiate and execute an IGRA inter-sovereign compact pursuant to the necessary-business clause of the Oregon constitution), Langley v. Edwards, 872 F.Supp. 1531, 1535 (W.D.La.1995) ("IGRA does not specify which branch of state government should negotiate with the Indian Tribe." (emphasis supplied)), aff'd, 77 F.3d 479, 1996 WL 46781 (5th Cir. 1996), and Willis v. Fordice, 850 F.Supp. 523, 527 (S.D.Miss.1994) ("One issue which the IGRA does not address, and which is the ultimate issue in this case, is which branch of a state government should negotiate the Tribal-State compact with the Indian tribe." (emphasis supplied)), aff'd, 55 F.3d 633 (5th Cir. 1995), with majority op. at 611-13 & n. 5 ("[N]owhere does IGRA equate `the state' with `the governor....' [A]lthough IGRA requires a state to negotiate, it does not impose any duty on a state's governor.... Congress knew how to refer to a `governor' when it wanted to do so.").
[12] However, such negotiations and the compacts they produce are subject to the dictates of article I, section 10 of the United States Constitution.
[13] A more appropriate remedy to challenge an allegedly erroneous or legally invalid decision of the Governor or an agency in an authorized capacity could be a declaratory-judgment action. The purpose of such an action is "to afford relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations, and it should be liberally construed." Martinez v. Scanlan, 582 So.2d 1167, 1170 (Fla. 1991) (emphasis supplied) (citing § 86.101, Fla. Stat. (1989)). For example, litigants have used declaratory-judgment actions to challenge the validity of statutes. See id.; see also N. Fla. Women's Health & Counseling Servs. v. State, 866 So.2d 612, 615 (Fla.2003) (clinics providing abortion services and women's rights organizations sought declaratory judgment that Parental Notice of Abortion Act was unconstitutional). Further, declaratory-judgment actions have been utilized to challenge executive orders issued by the Governor. See Bass v. Askew, 342 So.2d 145, 146 (Fla. 1st DCA 1977) (county commissioner sought declaration that executive order of suspension by the Governor was insufficient and Governor lacked the right to amend the order of suspension). Under each circumstance, the plaintiffs challenged the legal correctness of the relevant law or executive order, rather than the authority of either the Legislature to enact the law or the Governor to issue the executive order. Since the majority does not address the question of whether the Governor may enter into a compact, this appears to be a case in which we have chosen to address the legal correctness of the Governor's action instead of his ultimate authority to negotiate and enter into inter-sovereign compacts on behalf of the State.
[14] In Orange County v. City of Orlando, 327 So.2d 7 (Fla. 1976), the district court decision reviewed by this Court on the basis of express and direct conflict involved a challenge by Orange County to the annexation of property by the City of Orlando. See City of Orlando v. Orange County, 309 So.2d 16 (Fla. 4th DCA 1975). The Fourth District expressly noted that "[t]he proper method of seeking relief where a municipality has undertaken to exercise jurisdiction or control over land should be through a quo warranto proceeding." Id. at 16-17 (quoting Caldwell v. Losche, 108 So.2d 295, 296 (Fla. 2d DCA 1959)). However, this Court may only issue writs of quo warranto to state officers and state agencies. See Art. V, § 3(b)(8), Fla. Const. Since the availability of the writ in the district and circuit courts is not similarly limited, see article V, section 4(b)(3), 5(b), Florida Constitution, the reliance of the majority on Orange County to justify its conclusion that quo warranto review is proper here is dubious at best.
[15] The majority claims that the urgency of the instant situation mandates that we resolve this dispute by way of quo warranto. However, we should not permit parties to define this Court's jurisdiction by generating a false emergency. This issue of a compact with the Seminole Tribe has been known for sixteen years. What the majority fails to recognize is that the Legislature created the urgency when it failed to act during those years.