POLSTON, J.,
dissenting.
The majority improperly grants this petition for an extraordinary writ based on the hypothetical that the Governor might exceed his authority or violate the law. The majority is issuing an improper advisory opinion[16] holding that Executive Order 11-01 and Executive Order 11-72 should not be utilized to violate Florida’s Administrative Procedure Act “to the extent” they could hypothetically be used to do so. See majority op. at 705, 706, 707, 713 (repeatedly employing the equivocal phrase “to the extent”). This is not a sound basis for issuing a writ of quo war-ranto. To the contrary, Governor Scott has the express constitutional authority to issue Executive Order 11-72 as this State’s chief administrative officer charged with faithfully executing the law. See art. IV, § 1(a), Fla. Const.
Executive Order 11-72, which supersedes the now moot Executive Order 11-01, simply institutes a review of proposed and existing rules, a review that does not violate the separation of powers. The Petitioner has presented no evidence that this executive order violates Florida’s Constitution, Florida’s Administrative Procedure Act (APA), or a legislative delegation of rulemaking authority. Cf. Fla. House of Reps. v. Crist, 999 So.2d 601, 616 (Fla.2008) (“[T]he Governor’s execution of a compact authorizing types of gaming that are prohibited under Florida law violates the separation of powers.”). The Governor contends that he is exercising his authority under the Florida Constitution and has not violated the APA or altered the legislative delegation of rulemaking authority to state agencies. The Governor further contends that, if he violated the APA or‘altered the delegation of rulemaking authority, it would then be an unlawful act, but that issuing Executive Order 11-72 does not constitute such an act. I agree with the Governor’s view. Simply put, the Governor may act according to his executive order without violating any law, and no violation has been demonstrated.
I respectfully dissent.
I. BACKGROUND

A. The Executive Orders & Petitioner Whiley

On January 4, 2011, Governor Scott signed Executive Order 11-01, which created the Office of Fiscal Accountability and Regulatory Reform (OFARR) within the Executive Office of the Governor. Execu *719 tive Order 11-01 directed the agencies under the Governor’s supervision to suspend rulemaking and obtain OFARR’s direction before publishing the notices of rulemak-ing activity required by chapter 120, Florida Statutes (2010), Florida’s APA. Specifically, section 1 of Executive Order 11-01 provided as follows:
Section 1. I hereby direct all agencies under the direction of the Governor to immediately suspend all rulemaking. No agency under the direction of the Governor may notice the development of proposed rules, amendment of existing rules, or adoption of new rules, except at the direction of [OFARR]. The Secretary of State shall not publish rulemak-ing notices in the Florida Administrative Weekly except at the direction of [OFARR].
Thereafter, on April 8, 2011, Governor Scott issued Executive Order 11-72. Executive Order 11-72 expressly states that it supersedes Executive Order 11-01. Section 1 of Executive Order 11-72, which replaces the now moot section 1 of Executive Order 11-01 quoted above, provides as follows:
Section 1. I hereby direct all agencies under the direction of the Governor, pri- or to developing new rules or amending or repealing existing rules, to submit all proposed notices, along with the complete text of any proposed rule or amendment, to OFARR. These agencies shall also submit any other documentation required by OFARR, and no such agency may submit for publication any required notice without OFARR’s approval.
Therefore, under the current executive order, rulemaking is not suspended, and the Secretary of State is not required to seek OFARR’s approval before publishing notices required by the APA. Instead, under Executive Order 11-72, all agencies under the Governor’s supervision must submit proposed rules and proposed notices to OFARR and must receive OFARR’s approval before submitting any notices for publication.
Additionally, Executive Order 11-72 details OFARR’s general responsibilities. Section 3 provides that OFARR is to review proposed and existing rules to determine if they unnecessarily restrict entry into an occupation, adversely affect the availability of services, unreasonably affect job creation or retention, impose unreasonable restrictions on those seeking employment, or impose unjustified costs on businesses and consumers. OFARR is also tasked with the responsibility of analyzing the impact of proposed and existing rules on public health and safety as well as on job and business creation. Furthermore, section 3 specifies that “[c]onsistent with statutory provisions, [OFARR is to] work with the Florida Small Business Regulatory Advisory Council, the Office of Small Business Advocate, the Rule Ombudsman, [17] and the Florida Legislature, to identify rules and regulations, particularly those relating to small businesses, that have an adverse or disproportionate impact on business, and make recommendations for actions that would alleviate those effects.”
Section 6 of Executive Order 11-72 directs each agency under the Governor’s direction to conduct an annual review of *720 existing rules, including recommendations as to whether any rules should be modified or repealed. It also requires each agency “to identify any legislative mandates that require the agency to promulgate, or continue to impose, rules that the agency believes have a negative impact on business, job creation, or job retention in Florida.”
Finally, section 7 of Executive Order 11-72 requires each agency under the Governor’s supervision to “submit to OFARR an annual regulatory plan that shall identify and describe each rule that the agency expects to begin promulgating during the next twelve-month period.”
On March 28, 2011, Rosalie Whiley filed a petition for a writ of quo warranto in this Court, challenging the Governor’s authority to issue Executive Order 11-01.[18] Whi-ley argues that the executive order contravenes the separation of powers by violating the APA’s time limits and by violating the agency heads’ authority to propose rules and file rules for adoption.
Whiley alleges standing as a citizen taxpayer but also expresses a personal interest in the matter. According to her petition, Whiley is a food stamp recipient who must periodically reapply for her benefits using an online process that is difficult to complete due to her blindness. She contends that Governor Scott’s executive orders have directly caused an abeyance in the rulemaking process modifying the online application to make it easier for her to complete in compliance with federal law. However, Whiley’s counsel conceded during oral argument the accuracy of the statement in the Governor’s Response to the Petition for Writ of Quo Warranto, that the proposed amendment to the online application was approved by OFARR the day after it was submitted to the office by the Department of Children and Families, and that neither the executive order nor OFARR “has delayed or otherwise had a negative impact upon the rulemaking process surrounding DCF’s SNAP applications.” [19] Response to Petition for Writ of Quo Warranto at 12. Further, the administrative rule challenge proceeding, which was the subject of the abeyance described by Whiley, has been dismissed as moot because the Department actually modified the online application while the rule challenge was pending. See Etienne v. Dep’t of Children & Family Servs., Fla. Admin Order No. 10-5141RX (July 21, 2001) (on file with Clerk, Div. of Admin. Hearings).

B. Rulemaking Overview

Rulemaking under Florida’s APA is a complex process, but it is also a flexible one with room for agency discretion and public participation. See generally Patricia A. Dore, Access to Florida Administrative Proceedings, 13 Fla. St. U.L. Rev. 965, 988-1018 (1986). When an agency engages in rulemaking, it is performing a quasi-legislative function.[20] See Adam *721 Smith Enters., Inc. v. State Dep’t of Envtl. Regulation, 553 So.2d 1260, 1260-70 (Fla. 1st DCA 1989); see also Gen. Tel. Co. of Fla. v. Fla. Pub. Serv. Comm’n, 446 So.2d 1063, 1067 (Fla.1984). An agency can only engage in rulemaking if it has been granted the authority to do so from the Legislature. See § 120.52(17), Fla. Stat. (2010). Further, “[a] grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required.” § 120.536(1), Fla. Stat. (2010). And “[a]n agency may only adopt rules that implement or interpret the specific powers and duties granted by the enabling statute.” Id.
The rulemaking process (with the exception of emergency rules) begins in one of three ways. First, an agency on its own must initiate the process “as soon as practicable and feasible” after an agency statement becomes a rule of general applicability. § 120.54(l)(a), Fla. Stat. (2010). Second, the Legislature may require implementation of a statute by agency rules, and “such rules shall be drafted and formally proposed as provided in [the APA] within 180 days after the effective date of the act, unless the act provides otherwise.” § 120.54(l)(b), Fla. Stat. (2010). Finally, the process to adopt, amend, or repeal a rule can begin upon a petition to initiate rulemaking filed by a regulated person or a person having a substantial interest in a rule. § 120.54(7), Fla. Stat. (2010). An agency must initiate the rulemaking process or deny the petition in writing no later than thirty days after the petition is filed. Id.
An agency must provide notice of the development of proposed rules (with the exception of an intention to repeal a rule) in the Florida Administrative Weekly. § 120.54(2)(a), Fla. Stat. (2010). However, “[t]he APA establishes no particular procedure to be followed by an agency during the original drafting of the proposed rule.” Adam Smith, 553 So.2d at 1265 n. 4. An agency may choose to develop a proposed rule on its own, or it may choose to hold a public workshop or to utilize negotiated rulemaking between interested parties. See § 120.54(2)(c)-(d), Fla. Stat. (2010). However, if an affected person requests in writing a public workshop, an agency must hold one unless the agency head explains in writing why a workshop is not necessary. § 120.54(2)(e), Fla. Stat. Additionally, “[a]n agency head may delegate the authority to initiate rule development.” § 120.54(l)(k), Fla. Stat. (2010).
At least twenty-eight days prior to adoption and upon the agency head’s approval, a notice of the proposed rule must be published in the Florida Administrative Weekly, including the proposed rule’s text and a reference to the statute being implemented. § 120.54(3)(a), Fla. Stat. (2010). The agency may schedule a public hearing on the proposed rule and must do so if an affected party requests a public hearing within 21 days of the publication of intended agency action. § 120.54(3)(c)l, Fla. Stat. (2010).
*722 As a legislative check, the agency must also file the proposed rule with the Administrative Procedures Committee. § 120.54(3)(a)4, Fla. Stat. (2010); § 120.545(1), Fla. Stat. (2010). If the Administrative Procedures Committee objects to the proposed rule, the agency must respond. § 120.545(3), Fla. Stat. (2010). And if the agency does not initiate administrative action to address the committee’s objection, the committee may recommend legislative action to address it. § 120.545(8)(a), Fla. Stat. (2010).
Additionally, the APA provides that certain matters must (or should) be considered during the rule adoption process. For instance, “all agencies must, among the alternative approaches to any regulatory objective and to the extent allowed by law, choose the alternative that does not impose regulatory costs on the regulated ... which could be reduced by the adoption of less costly alternatives that substantially accomplish the statutory objectives.” § 120.54(l)(d), Fla. Stat. (2010). Moreover, prior to adoption, an agency is encouraged to prepare a statement of estimated regulatory costs and is required to do so if the proposed rule will impact small businesses. § 120.54(3)(b)l, Fla. Stat. (2010). The statement of estimated regulatory costs must include “[a] good faith estimate of the number of individuals and entities likely to be required to comply with the rule,” a good faith estimate of the cost to the agency or other government entity to implement and enforce the rule, and “[a] good faith estimate of the transactional costs likely to be incurred by individuals and entities ... to comply with the requirements of the rule.” § 120.541(2), Fla. Stat. (2010). Further, the APA provides that an agency is required whenever practicable to “tier its rules to reduce disproportionate impacts on small businesses, small counties, or small cities ... that do not contribute significantly to the problem the rule is designed to address.” § 120.54(3)(b)2.a., Fla. Stat. (2010).
Within 21 days of the publication of a proposed rule notice, a substantially affected person may submit a written proposal for a lower cost alternative. § 120.541, Fla. Stat. (2010). Upon submission of a proposal, the agency must prepare a statement of estimated regulatory costs or revise its previously prepared statement. Id. Then, the agency must either adopt the lower cost alternative or explain its reasons for rejecting it in favor of the proposed rule. Id.
A substantially affected person may also “seek an administrative determination of the invalidity of the [proposed rule or an existing] rule on the ground that the rule is an invalid exercise of delegated legislative authority.” § 120.56(l)(a), Fla. Stat. (2010). The APA defines an invalid exercise of delegated legislative authority to include any of the following:
(a) The agency has materially failed to follow the applicable rulemaking procedures or requirements set forth in [the APA];
(b) The agency has exceeded its grant of rulemaking authority ...;
(c) The rule enlarges, modifies, or contravenes the specific provisions of law implemented ...;
(d) The rule is vague, fails to establish adequate standards for agency decisions, or vests unbridled discretion in the agency;
(e) The rule is arbitrary and capricious.; or
(f) The rule imposes regulatory costs on the regulated person, county, or city which could be reduced by the adoption of less costly alternatives that substantially accomplish the statutory objectives.
*723 § 120.52(8), Fla. Stat. (2010). And an administrative law judge (ALJ) must hold a hearing on the petition challenging the rule within a specified timeframe. § 120.56(l)(c), Fla. Stat. (2010). If the ALJ determines that a proposed rule is partially or wholly invalid, the proposed rule may not be adopted unless the ALJ’s determination is reversed on appeal.[21] § 120.56(2)(b), Fla. Stat. (2010).
A proposed rule is adopted when it is filed, upon the agency head’s approval, with the Department of State. § 120.54(3)(e), Fla. Stat. (2010). It cannot be filed for adoption less than 28 days or more than 90 days after the publication of the notice of proposed rulemaking, “until 14 days after the final public hearing, until 21 days after a statement of estimated regulatory costs ... or until the administrative law judge has rendered a decision” in a challenge to a proposed rule, whichever is applicable. § 120.54(3)(e)2., Fla. Stat. (2010).
Importantly, an agency has the discretion to withdraw or modify a proposed rule after the publication of the notice of the proposed rule but before the rule is adopted. § 120.54(3)(d), Fla. Stat. (2010). An agency is required to withdraw a proposed rule if the time limits and other requirements of the APA have not been satisfied. § 120.54(3)(e)5., Fla. Stat. (2010). Thereafter, an agency must notice its withdrawal or modification in the Florida Administrative Weekly. § 120.54(3)(d), Fla. Stat.; § 120.54(3)(e)5., Fla. Stat. But once a rule has become effective, it can only be repealed or amended through the rulemak-ing process. § 120.54(3)(d)5., Fla. Stat. (2010).
II. ANALYSIS
Under section 3(b)(8) of article V of the Florida Constitution, this Court may issue writs of quo warranto to “state officers and state agencies.” “The term ‘quo warranto’ means ‘by what authority.’ ” Crist, 999 So.2d at 607. “This writ historically has been used to determine whether a state officer or agency has improperly exercised a power or right derived from the State.” Id. However, in exercising our jurisdiction to issue writs of quo warranto, it is important to keep in mind that they are extraordinary writs. Extraordinary writs should only be employed with great caution and under very limited circumstances. See English v. McCrary, 348 So.2d 293, 296 (Fla.1977); Curtis v. Albritton, 101 Fla. 853, 857, 132 So. 677 (Fla.1931); Sica v. Singletary, 714 So.2d 1111, 1112 (Fla. 2d DCA 1998); Broward County v. Fla. Nat’l Props., 613 So.2d 587, 588 (Fla. 4th DCA 1993); see also Chiles v. Phelps, 714 So.2d 453, 457 (Fla.1998) (explaining that usually the constitutionality of an act should be challenged in a declaratory action in circuit court, and that this Court only accepts jurisdiction in extraordinary writ proceedings “where the functions of government would be adversely affected absent an immediate determination by this Court”). Therefore, extraordinary writs should not be employed to address hypothetical scenarios. In fact, one cannot even seek the ordinary remedy of a declaratory judgment based upon hypothetical facts. See Roberts v. Brown 43 So.3d 673, 680 (Fla.2010).
Here, no one disputes that Governor Scott has the authority to issue executive orders. And Executive Order 11-72 is entirely within his constitutional authority as chief administrative officer and his constitutionally vested duty to manage, plan, and hold agencies under his charge ac~ *724 countable to State laws, including the APA. The actual facts before us do not demonstrate otherwise.
Article IV, section 1(a) of the Florida Constitution provides that “[t]he supreme executive power shall be vested in a governor,” “[t]he governor shall take care that the laws be faithfully executed,” and “[t]he governor may require information in writing from all executive or administrative state, county or municipal officers upon any subject relating to the duties of their respective offices.” Section 1(a) also provides that “[t]he governor shall be the chief administrative officer of the state responsible for the planning and budgeting for the state.” Section 6 of article IV states that “[t]he administration of each department, unless otherwise provided in this constitution, shall be placed by law under the direct supervision of the governor ... or an officer or board appointed by and serving at the pleasure of the governor.”
Based upon these provisions, the governor of Florida has the constitutional authority to act as this State’s chief administrative officer as well as the constitutional duty to faithfully execute this State’s laws and to manage and hold agencies under his charge accountable to State laws, including the APA. This Court has explained that “[t]he Governor is given broad authority to fulfill his duty in taking ‘care that the laws be faithfully executed.’ ” In re Advisory Op. to Governor, 290 So.2d 473, 475 (Fla.1974) (quoting Finch v. Fitzpatrick, 254 So.2d 203, 204 (Fla.1971)); see also Advisory Op. to the Governor — 1996 Amendment 5 (Everglades), 706 So.2d 278, 280-81 (Fla.1997). This Court has also recognized that that a Governor’s actions are presumptively in accord with his official duties. See Kirk v. Baker, 229 So.2d 250, 252 (Fla.1969).
Florida law provides no specific process for carrying out the Governor’s executive duties with respect to holding his executive agencies accountable in their rulemaking functions. Governor Scott has chosen to rely upon an accountability structure by which the Governor, through OFARR, reviews existing and proposed rules to ensure that the rules are in accord with the codified goals and requirements of the APA. For example, to ensure that an agency is meeting its responsibility to consider the effect of a proposed rule on small businesses as required by section 120.54(3)(b), OFARR is tasked with the responsibility of identifying rules that will have an adverse effect on businesses (particularly small businesses) and recommending actions to alleviate those effects. And to ensure that an agency is considering less costly alternatives as required by sections 120.54(l)(d) and 120.541, OFARR reviews proposed rules to determine if they impose unjustified costs and makes recommendations for simplifying the regulations.
Nothing in the APA prohibits the Governor from performing executive oversight to ensure that the rulemaking process at his agencies results in effective and efficient rules that accord with Florida law. To the contrary, a recent amendment to the APA acknowledges and implicitly approves of the Governor’s oversight through OFARR. See ch.2011-225, Laws of Fla. (providing that the required biennial review of an agency’s existing rules must include a “[rjeview of each rule to determine whether the rule has been reviewed by OFARR”).
Additionally, contrary to the majority’s [22] and the Petitioner’s suggestions otherwise, the Governor’s executive order *725 does not violate the Legislature’s delegation of rulemaking authority. Executive Order 11-72 does not impermissibly delegate or transfer the agency’s or the agency head’s responsibilities under the APA to OFARR. For example, the Legislature has specifically delegated to agency heads the rulemaking authority to approve notices of proposed rules and the filing of rules for adoption. See § 120.54(l)(k), Fla. Stat. (“An agency head may delegate the authority to initiate rule development under subsection (2); however, rulemaking responsibilities of an agency head under subparagraph (3)(a)l., subparagraph (8)(e)l., or subparagraph (3)(e)6. may not be delegated or transferred.”). Under Executive Order 11-72, agency heads still must approve the notices required by section 120.54(3)(a)l, and they still must approve the filings with the Department of State required by sections 120.54(3)(e)l and 120.54(3)(e)6. However, nothing in the APA prohibits an agency from receiving OFARR’s approval before an agency head authorizes the publication of notices of rulemaking activity and the filing of rules for adoption.
The Petitioner more specifically alleges that the Governor’s executive orders violate the APA’s time limits for adopting or withdrawing proposed rules. However, to the contrary, no provision of Executive Order 11-72 suspends the APA’s time limits or requires agencies to violate them. All agencies remain subject to the APA’s time limits, and the Governor remains constitutionally responsible for ensuring that Florida’s laws, including the APA’s time limits, are faithfully executed by the agencies under his supervision. Therefore, an agency must still initiate the rulemaking process (1) once an agency statement becomes a rule of general applicability, (2) 180 days after the effective date of the statute to be implemented, or (3) 30 days after a petition to initiate rulemaking is filed. See §§ 120.54(1), (7) Fla. Stat. (2010). And once the rulemaking process is initiated, the agency is still responsible for abiding by the APA’s other time limits. See, e.g., 120.54(3)(e)2., Fla. Stat.
Petitioner has not demonstrated in this record a single instance of the Governor’s executive order causing any -violation of the requirements proscribed by the APA. Moreover, if hypothetically speaking an agency violated an APA requirement due to Governor Scott’s actions under the executive order, such a violation should be challenged under the remedies provided by the APA, not in an extraordinary writ proceeding before this Court. See, e.g., § 120.56, Fla. Stat. (2010); § 120.68(1), Fla. Stat. (2010).
Instead of examining the facts of this case and the language of Executive Order 11-72, which is the only operative executive order at this point and therefore the only proper executive order to examine, the majority’s opinion assumes that Governor Scott is incapable of acting (or unwilling to act) within the bounds of Florida law. But no provision of the Executive Order 11-72 conflicts with any Florida law. It is entirely possible for an agency to comply with all of the provisions of Executive Order 11-72 as well as all of the requirements of the APA. To get around this, the majority improperly employs the opposite of the standard used for a facial challenge. In other words, the majority construes Executive Order 11-72 (together with moot Executive Order 11-01) in a way to effect an unconstitutional outcome by coming up with a hypothetical set of circumstances under which the executive order would be invalid, rather than determining whether there is no set of circumstances under which the executive order would be valid. Cf. Fla. Dep’t of Rev. v. City of Gainesville, 918 So.2d 250, 256 (Fla.2005) (explaining that this Court is *726 “obligated to accord legislative acts a presumption of constitutionality and to construe challenged legislation to effect a constitutional outcome whenever possible,” and that “a determination that a statute is facially unconstitutional means that no set of circumstances exists under which the statute would be valid”) (quotations and citations omitted).
Specifically, the majority’s decision supposes a hypothetical whereby Executive Order 11-72 (specifically the requirement that OFARR approve notices for publication) could somehow indefinitely suspend and terminate rulemaking under the APA. See majority op. at 706, 713, 714-15, 716-17. However, there is no evidence in this record that the order has caused any such suspension and termination. Instead, the record includes a statement from the Governor’s counsel that OFARR usually completes its review of proposed rulemaking activity in less than a week and can process urgent requests even faster. The Petitioner even acknowledged during oral argument that the proposed amendment to the online application for food stamps that was of concern to her was approved by OFARR the day after it was submitted to the office by the Department of Children and Families. Accordingly, there is no evidence in this record that Executive Order 11-72 has resulted in any suspension and termination of rulemaking under the APA, and the order does not facially require it. The majority’s hypothetical envisioning the contrary is improper in this extraordinary writ proceeding. See English, 348 So.2d at 296 (explaining that extraordinary writs should be employed cautiously and in only very limited circumstances).
III. CONCLUSION
Under article IV, section 1(a) of the Florida Constitution, Governor Scott is this State’s chief administrative officer charged with faithfully executing the law and with managing and ensuring that the agencies under his control also faithfully execute the law, including the APA. Governor Scott was completely within this constitutional authority when he issued Executive Order 11-72, which institutes a review of existing and proposed rules that is consistent with the APA’s requirements and goals. Therefore, instead of issuing an improper advisory opinion addressing hypothetical facts and a moot executive order, I would deny the petition for a writ of quo warranto. I respectfully dissent.
CANADY, C.J., concurs.

. See Santa Rosa County v. Admin. Comm’n, Div. of Admin. Hearings, 661 So.2d 1190, 1193 (Fla.1995) (explaining that Florida courts should not render what amounts to an advisory opinion if parties show only the possibility of an injury based on hypothetical facts that may or may not arise in the future).

. Through section 288.7015, Florida Statutes (2010), the Legislature requires the Governor to appoint a Rules Ombudsman within the Executive Office of the Governor "for considering the impact of agency rules on the state’s citizens and businesses.” The Rules Ombudsman makes "recommendations on any existing or proposed rules to alleviate unnecessary or disproportionate adverse effects to businesses.” § 288.7015(3), Fla. Stat. (2010).

. No amended petition was filed challenging Executive Order 11-72.

. Petitioner's improper response to Respondent's supplemental authority after oral argument appears to contradict her concession at oral argument. To the extent that Petitioner now claims that the executive order caused delay, it should be ignored or the case should be sent to the circuit court for determination of a disputed fact.

. The majority misstates that agency “rule-making is a legislative function.” See majority op. at 710. To the contrary, when an agency engages in rulemaking pursuant to a legislative delegation of rulemaking authority, it is engaging in a quasi-legislative function. See Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla.1979) ("Flexibility by an administrative agency to administer a legislatively articulated policy is essential to meet the complexities of our modern society, but flexibility in administration of a legislative pro *721 gram is essentially different from reposing in an administrative body the power to establish fundamental policy.”). In other words,
a delegation of authority is constitutional as long as the enabling statute establishes constitutionally adequate guidelines limiting the scope of authority that may be exercised and does not involve a core power of one of the branches of government. In such cases the legislature has delegated only quasi-legislative or quasi-judicial power.
Florida Administrative Practice § 1.12 (8th ed. 2009) (emphasis added) (citing Adam Smith Enters., Inc. v. State Dep’t of Envtl. Regulation, 553 So.2d 1260 (Fla. 1st DCA 1989)).

. If the ALJ determines that an existing rule is partially or wholly invalid, the rule is void after the time for appeal expires. § 120.56(3)(b), Fla. Stat. (2010).

. See majority op. at 710, 713.